CARL W. VAN ROEKEL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Van Roekel v. Commissioner
Docket No. 31448-86.
United States Tax Court
T.C. Memo 1989-74; 1989 Tax Ct. Memo LEXIS 74; 56 T.C.M. (CCH) 1297; T.C.M. (RIA) 89074; February 23, 1989; As amended February 28, 1989 Robert D. Howard and Kenneth A. Lapatine, for the petitioner. Michael D. Wilder, Roland Barral, and Gina A. Makoujy, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined a deficiency in petitioner's Federal income tax for 1982, additions to tax, and additional interest as follows: Additions to Tax and Additional Interest
Sec.
Sec.
Sec.
Sec.
Sec.
Deficiency
6653(a)(1) [1]
6653(a)(2)
6659
6661
6621(c)
$ 38,978.58
$ 1,948.93 *
$ 11,693.57 ** ***
After concessions, the issues for decision are generally (1) whether petitioner, as *78 a grantor/beneficiary of the Capital Equipment Trust 1982 (the Trust), is entitled to a loss claimed with respect to the Trust's purchase and lease of certain computer equipment; and (2) whether petitioner is liable for additions to tax under sections 6653(a), 6659, and 6661 and for additional interest under section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioner resided in Pasadena, Texas, when the petition was filed. Background
The principal actors in the purchase and leaseback transactions at issue were Capital Associates International, Inc. (CAI) and its subsidiary Capital Equipment Corporation (CEC), NIS Corporation (NIS), Kidder, Peabody & Co. (Kidder Peabody), and the Trust. CAI, CEC, and NIS were at all relevant times engaged in the business of equipment leasing, remarketing, or financing. Kidder Peabody was an investment banking firm. For 30 years prior to and through the trial of this case in March 1988, petitioner was personally engaged in the sale and leasing of construction equipment. In 1970 petitioner established and incorporated Vermeer Sales *79 of Texas, Inc. (Vermeer), of which he was president and sole shareholder. From the time of its incorporation, Vermeer was engaged in the business of purchasing, selling and leasing trenching machines, primarily to contractors and municipalities. As president, petitioner was involved in purchasing the equipment, negotiating the leases, and determining the rental rates charged by Vermeer for its equipment. In determining the rental rates, petitioner would estimate the useful life and take into account the residual value of the item of equipment. In October 1982, L. Burke Crouse (Crouse) of CAI contacted Kenneth F. Seplow (Seplow) of Kidder Peabody about a proposed sale of certain computer equipment to Kidder Peabody. Under Crouse's proposal, Kidder Peabody would resell the equipment to retail investors, who would then lease the equipment back to CAI. The subject equipment consisted of six IBM mainframe computer processors and collateral support equipment (the initial equipment) from the IBM 3081 series. The computers were 3081-D and 3081-G models, which in terms of capacities were at the lower end of the 3081 series. As of October 1982, CAI had purchased five of the computers, *80 and had arranged to purchase the sixth, for a combination of cash and nonrecourse financing to third-party lenders. CAI leased for 60-month terms two of the computers to Standard Oil Company of Indiana (Standard Oil), two to Deere & Company (Deere), and one each to Harris Corporation (Harris) and American Broadcasting Company (ABC) (collectively, the end-users). The Standard Oil, Harris, and Deere leases commenced on particular dates between May 1 and December 1 of 1982. The ABC lease commenced on April 1, 1983. IBM technology permitted the capacities of the Model 3081-D and Model 3081-G to be upgraded to what was labeled the Model 3081-K. Kidder Peabody declined to serve the dual role of seller of the equipment and agent for the placement of the equity interests. Seplow proposed, however, introducing NIS as the intermediary between CAI and an investor trust to be formed by Kidder Peabody. The investor trust would hold title to the equipment for the investors and lease it back to CAI or an affiliate of CAI. It was the intention of CAI and Kidder Peabody that, after the back-to-back sales and leaseback of the initial equipment, the equipment would be upgraded to the Model 3081-K. *81 Kidder Peabody retained International Data Corporation (IDC) to perform an appraisal of the subject equipment. IDC was a research and consulting firm specializing in the high technology and third-party leasing industries. Kidder Peabody knew that IDC rendered consulting services both to investors in high technology equipment and to end-users of equipment. Because more of IDC's clients were users of equipment than were investors, Seplow believed that IDC's evaluation of the equipment would be conservative. IDC regularly published equipment valuation projections, which were analyzed by Kidder Peabody and determined to be conservative in light of Kidder Peabody's view that future changes in IBM equipment would be evolutionary rather than revolutionary. IDC's appraisal, dated November 18, 1982, was prepared by Charles Greco (Greco), who was then manager of IDC's Leasing Planning Service. Greco determined that the fair market values on November 15, 1982, of the 3081 series of computers were the following percentages of IBM list prices: Model
Percentage
3081-D
90-100%
3081-G
100%+
3081-K
100% Greco determined that computer equipment of the same type *82 as the appraised equipment "will continue to be used by users for at least another 8.5 years and it would not be unreasonable to assume such use for 10 years." The appraisal indicated that the equipment would have the following residual values, in terms of percentages of IBM list prices as of November 15, 1982, at (a) January 1, 1987 (the year of the expiration of the initial term of five of the six end-user leases) and (b) January 1, 1989 (the year of the expiration of the proposed leaseback): 1987
1989
Model
Residual
Residual
3081-D
17%
4%
3081-G
21%
9%
3081-K
21%
9%
The appraisal also set forth a schedule of "Release Forecasts." The Release Forecasts were determined for the 2-year period between the expiration of the end-user leases and the expiration of the proposed leaseback (i.e., the period 1987-1989), and set forth possible combinations of two 1-year releases or one 2-year re-lease of the equipment. The Release Forecasts set forth "Low," "Medium," and "High" values for the various machines, with and without upgrading. Kidder Peabody used the appraisal to prepare a series of profit projections to determine whether an investment in the equipment *83 would produce an economic profit to the Trust investors. The projections were prepared by William P. Short, III (Short), an assistant vice president of Kidder Peabody and a member of its Project and Lease Finance Group. The projections set forth three alternative cases of the leasing and ultimate sale of the equipment, assuming that the equipment was upgraded to 3081-K: (a) a "Base Case" - which assumed that the Trust would receive 70 percent of the 24-month "medium" re-lease rents projected by the appraisal, and that the equipment would be sold at the 1989 residual values set forth in the appraisal; (b) a "Zero Percent Residual Value Case" - which assumed that no re-lease rents or sales proceeds would be received; and (c) an "Upside Residual Value Case" - which assumed that the Trust would receive 70 percent of the rentals from two 12-month re-leases of the equipment and that the equipment would be sold at the 1989 residual values set forth in the appraisal. The projections also set forth the same alternatives on the assumption that the equipment was not upgraded to 3081-K. Under the "Zero Percent Residual Value Case," a one-unit investor would not receive any cash distributions *84 from the Trust and would therefore lose his entire investment. Under the "Base Case," assuming the equipment was upgraded, an investor purchasing one unit in the Trust for $ 52,390 would receive, beginning in 1987, total cash distributions from the Trust of $ 59,952. Under the "Upside Residual Value Case," a one-unit investor would receive, beginning in 1987, $ 87,218. In November 1982, Kidder Peabody and CAI, as co-sponsors, began offering investments in the Trust. The offering literature for the Trust, which Kidder Peabody furnished prospective investors, essentially consisted of a Private Placement Memorandum, together with exhibits. The Private Placement Memorandum advised prospective investors in the Trust: Although the tax benefits anticipated from the Trust could be said to have the effect of providing a return on investment in the earlier years, tax obligations will arise in later years; the ultimate success of the Trust will therefore depend upon the profitability of its business which will, in turn, depend upon the Residual Value of the Equipment at the end of the User Leases and the Main Lease, including Additional Rent, if any. [Emphasis in original.] The *85 Private Placement Memorandum stated that, as part of the cost of a unit in the Trust, each investor was required to assume personal liability for his or her proportionate share of the indebtedness to be incurred by the Trust in connection with its purchase of the equipment, amounting to $ 132,164 per Trust unit. In addition, the Private Placement Memorandum stated that the investors in the Trust would not be entitled to any investment tax credit in connection with their investment. The Private Placement Memorandum included a copy of IDC's appraisal of the equipment and Kidder Peabody's profit projections with respect to investments in the Trust. A memorandum describing the investment in the Trust was prepared by the Kidder Peabody "Tax Incentive Group" entitled "Summary of Capital Equipment Trust 1982" dated November 22, 1982 (the Summary). The Summary was prepared for the use of the Kidder Peabody retail sales force. The following paragraph appeared on page 2 of the Summary: NIS Corp. will purchase the equipment from CAI subject to the user leases and financing. The role of NIS Corp. in this sequence of transactions is to create an arm's length intermediate sale between CEC *86 and the Trust so that the recourse to the investors on the Trust's financing will have substance for tax purposes. NIS Corp. has no other role of substance in the transaction. In late November 1982, petitioner's investment advisor brought to his attention the opportunity of investing in the Trust. Petitioner obtained and read the Private Placement Memorandum and understood the appraisal and the projections contained therein. The Declaration of Trust
The Trust was formed pursuant to a Declaration of Trust (the Declaration) dated December 1, 1982. Its stated purposes were generally to acquire, own, lease, and dispose of the initial equipment and K upgrades. The Declaration stated that the Trust would terminate no later than 9 years and 11 months from its formation. The Trust was a grantor trust. Article III, section 2, of the Declaration stated that each unit owner (Owner) would be liable for additional contributions to the Trust as necessary to pay a pro rata share of the amounts due under the Trust's purchase notes. The additional contributions would be payable in installments equal to the Owner's share of any amount then due under the notes. Article V, section 1, *87 required the Trustees to apply all receipts from the lease or sale of the equipment in the following order of priority: (a) to pay installments of principal and interest on the notes to be issued to NIS in connection with the purchase of the equipment; (b) to pay the Trust's administrative costs; and (c) to pay any excess not otherwise committed or reserved as a distribution to the Owners in proportion to each Owner's beneficial interest. The Transactions
On December 1, 1982, CAI assigned the initial equipment, subject to the end-user leases, to CEC, its wholly owned subsidiary organized exclusively for the transactions. On the same date (a) CEC sold the initial equipment to NIS, which (b) sold the same to the Trust, which (c) leased the initial equipment to CEC. The relevant terms of these transactions are described below. a. The Sale from CEC to NIS
Under the purchase agreement between CEC and NIS (the NIS Purchase Agreement), CEC sold the initial equipment to NIS, subject to the end-user leases and to the obligations to third-party lenders, for a price of $ 21,900,578, payable as follows: Cash, due at time of sale
$  1,121,029
Promissory Note
20,779,549
*88 The NIS Purchase Agreement stated that, upon NIS's sale of the equipment to the Trust, CEC would recognize the Trust as the owner of the equipment. It further stated that, in the event NIS failed to make payments due under the NIS note, the Trust had an absolute right to cure the default of NIS, and CEC would recognize and accept the Trust's exercise of any right inuring to NIS under the NIS Purchase Agreement. Pursuant to the terms of the NIS Purchase Agreement, NIS paid the downpayment and executed a nonrecourse, nonnegotiable promissory note dated December 1, 1982, in the amount of $ 20,779,549 (the NIS note). The NIS note expressly indicated that CEC would look solely to the initial equipment for all payments and obligations due under the NIS note and that NIS would not be personally liable for any deficiency thereunder. The NIS note bore annual interest of 13.4 percent and was to mature on November 30, 1989. The NIS note called for payments by NIS to CEC as follows: On execution
$ 2,738,971.00
(prepaid interest
for 1982 and 1983)
February 28, 1983
$    696,114.89
(representing interest
only)
27 Quarterly Payments
beginning May 31, 1983
each in the amount of
$ 1,181,432.30
*89 The $ 2,738,971 payment due on execution included the $ 696,114.89 due on February 28, 1983, and the interest portion of the quarterly payments due for 1983. NIS granted CEC a security interest in the initial equipment, or its replacements, and all rents and proceeds therefrom. By March 1983, NIS paid the $ 2,738,971 in interest due pursuant to the terms of the NIS note. As discussed below, the NIS Note was replaced in 1983 by the NIS Replacement Note and the NIS Second Replacement Note in connection with NIS's purchase of certain upgrade equipment. b. The Sale from NIS to the Trust
Under the purchase agreement between NIS and the Trust, dated December 1, 1982 (the Trust Purchase Agreement), NIS sold the initial equipment to the Trust, subject to the end-user leases and the obligations to CEC and the third-party lenders, for a purchase price of $ 21,920,578. The purchase price was payable as follows: Cash, due at time of sale
$  1,141,029
Promissory note
20,779,549
Petitioner and respondent agree that the Trust purchased the equipment for its fair market value. Pursuant to the Trust Purchase Agreement, the Trust paid NIS $ 1,141,029 and *90 issued a "recourse" promissory note to NIS (the Trust note). The Trust secured the Trust note by granting NIS a security interest in the initial equipment, or its replacements, and the rents and other proceeds therefrom. The Trust note was nonnegotiable, bore interest at 13.425 percent per annum, and was to mature on November 30, 1989. The Trust note called for payments by the Trust to NIS as follows: On execution
$ 2,738,971.00
(prepaid interest
for 1980282 and 1983)
February 28, 1983
$   697,413.61
(representing interest
only)
27 Quarterly Payments
beginning May 31, 1983
each in the amount of
$ 1,182,291.70
The $ 2,738,971 payment due on execution included the $ 697,413.61 due on February 28, 1983, and the interest portion of the quarterly payments due for 1983. The Trust paid $ 1,008,092 of this sum on December 1, 1982, and the balance of this sum on or before March 1, 1983. Under the terms of the Trust note, the principal amount and accrued interest would become immediately due in the event of the Trust's default. Notwithstanding anything to the contrary under the Trust note or the security agreement, NIS would be required to *91 proceed first against the collateral under the security agreement prior to exercising any other remedy it would have against the Trust in the event the Trust did not pay NIS as required under the Trust note. The Trust note required NIS to remit, when due, from installment payments made by the Trust to NIS thereunder, all installments and charges due to CEC under the NIS note. The Trust note stated that each owner-beneficiary of the Trust would be personally liable for a pro rata share of the payments due thereunder. As discussed below, the Trust note was later replaced by the Trust Replacement Note and the Trust Second Replacement Note in connection with the Trust's purchase of the upgrade equipment. c. The Lease Between the Trust and CEC, the Guaranty and the Remarketing Agreement
Pursuant to an Agreement of Lease dated December 1, 1982 (the Main Lease), the Trust net leased the initial equipment to CEC for an 84-month term beginning on December 1, 1982, for the following quarterly rentals (the Fixed Rent): Quarter 1
-0- Quarters 2-4
$    502,572.00
Quarters 5-28
1,182,891.70
In addition to the Fixed Rent, CEC agreed to pay the Trust *92 "Participation Rent" equal to 70 percent of all re-lease rents in excess of $ 5,000 in each lease year derived from leasing or subleasing the initial equipment after the expiration of the initial term of the end-user leases, less marketing expenses. Under the Main Lease, CEC's obligation to pay rent to the Trust was absolute; however, in the event NIS failed to make any installment payments when due under the NIS note, CEC would have the option to set off, or defer, against its payment of rent to the Trust, the amount which NIS owed. The Main Lease entitled CEC to replace any item of the equipment with any like kind equipment; it required that such substitute equipment be reasonably satisfactory to the Trust, free of encumbrances, and equal or greater in fair market value and have a 5-year recovery period for tax purposes. The Main Lease stated that neither the Trust nor CEC could sell, assign, transfer, or encumber the equipment without first obtaining the written consent of the other party. Pursuant to a Guaranty dated December 1, 1982, CAI guaranteed CEC's performance of all obligations to the Trust under the Main Lease as follows: FOR VALUE RECEIVED AND IN CONSIDERATION *93 for Capital Equipment Trust 1982, a New York Grantor Trust (the "Trust") entering into that certain Lease dated as of December 1, 1982 (the "Agreement") with Capital Equipment Corporation ("CEC"), the undersigned ("Guarantor") hereby unconditionally and irrevocably guarantees to the Trust the performance by CEC of all obligations (the "Obligations") on its part to be performed under the Lease, that certain Purchase Agreement dated as of December 1, 1982 between CEC and NIS Corp. relating to the equipment which is the subject of the Lease (the "Purchase Agreement") and all documents and instruments executed pursuant to the Purchase Agreement (the "Other Documents"). The Guarantor further agrees to pay all expenses (including attorneys fees and legal expenses) paid or incurred by the Trust in endeavoring to enforce this guaranty. The Guarantor agrees that, in the event of the dissolution of the Guarantor, or the inability of the Guarantor for the benefit of creditors, or the institution of any proceeding by or against the Guarantor alleging that the Guarantor is insolvent or unable to pay debts as they mature, and if such event shall occur at a time when any of the Obligations *94 may not then be due and payable, the Guarantor will upon demand by Trust pay to Trust forthwith the full amount which would be payable hereunder by the Guarantor if all Obligations were then due and payable. * * * No delay on the part of the Trust in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by the Trust of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy. No action of the Trust permitted hereunder shall in any way impair or affect this Guaranty. For the purpose of this Guaranty, Obligations shall include all obligations of CEC to the Trust, notwithstanding any right or power of CEC or anyone else to assert any claim or defense as to the invalidity or unenforceability of any such obligation, and no such claim or defense shall impair or affect the obligations of the undersigned hereunder. This is a continuing, absolute and unconditional Guaranty irrespective of the validity, regularity or enforceability of the Lease, the Purchase Agreement, the Other Documents, or any provision thereof, and regardless of any setoff, counterclaim, or any other circumstances *95 which might constitute a legal or equitable defense or discharge of a guarantor or surety and the undersigned * * * (iv) agrees that the obligation of the undersigned shall not be affected or decreased by any amendment, termination, extension, renewal, waiver, or any modification of said Lease, the Purchase Agreement, the Other Documents. This Guaranty shall inure to the benefit of the successors and assigns of the Trust and shall be binding upon the successors and assigns of Guarantor and shall be governed and construed in accordance with the laws of the State of New York. The Trust and CEC executed a Remarketing Agreement dated December 31, 1982, whereby the Trust appointed CAI as its agent to remarket or sell the initial equipment. The term of the Remarketing Agreement was to commence on December 1, 1989, the expiration date of the Main Lease, and expire November 30, 1991. Under the Remarketing Agreement, the Trust would pay CAI a fee of 30 percent of gross re-lease proceeds and 20 percent of gross proceeds generated by virtue of sales of the equipment, plus CAI's remarketing costs. d. Petitioner's Acquisition of the Trust Unit
On December 8, 1982, petitioner *96 executed a "Subscription Agreement and Power of Attorney" (the Subscription Agreement), subscribing to one unit of beneficial interest in the Trust. Each unit represented a 1-percent beneficial interest in the Trust. The purchase price of the unit was $ 52,390, payable by $ 8,800 in cash, an interest-bearing promissory note for $ 35,200, and a noninterest-bearing note for $ 8,390. The interest-bearing note was payable to the extent of $ 21,100 on March 1, 1983. The balances of the interest-bearing note and the noninterest-bearing note were payable on March 1, 1984. The notes were to be secured by letters of credit. Under the Subscription Agreement, petitioner granted the trustees a power of attorney to execute and deliver on his behalf the Declaration of Trust and granted Kidder Peabody a power of attorney to complete the Declaration of Trust and to execute various instruments on his behalf in connection with his acquisition of a Trust unit. Petitioner paid the cash due under the Subscription Agreement and executed the notes on December 15, 1982. Petitioner ultimately paid a total of $ 49,455, plus interest, for his unit in the Trust. The difference between $ 52,390 and $ *97 49,445 represented a refund to him of $ 2,945 which was attributable to the Trust acquiring less upgrade equipment (discussed below) than originally anticipated. Post-Taxable Year Activity
In an agreement dated December 1, 1983, CEC sold to NIS equipment (the mandatory upgrades) to upgrade, from 3081-D to 3081-K, the computers leased to Deere and Harris. The agreement required NIS to pay $ 2,414,040 for the mandatory upgrades by a cash payment of $ 449,550 and the balance by nonrecourse promissory note. NIS executed a nonrecourse promissory note (the NIS Replacement Note) dated December 30, 1983, payable to CEC in the amount of $ 21,238,768 and scheduled to mature on November 30, 1989. This note replaced the NIS Note which had been delivered to CEC in connection with NIS's purchase of the initial equipment. By an agreement dated December 30, 1983, NIS sold the mandatory upgrades to the Trust for $ 2,414,040, payable by cash in the amount of $ 449,550 and the balance by promissory note. The Trust thereby executed a "nonrecourse" promissory note dated December 30, 1983 (the Trust Replacement Note), payable to NIS in the amount of $ 21,240,037 and maturing November 30, 1989. *98 This note replaced the Trust Note which had been delivered to NIS in connection with the Trust's purchase of the initial equipment. Pursuant to an Amendment to Lease dated December 30, 1983, the Trust leased the mandatory upgrades to CEC, which had leased them to the end-users. In an agreement dated December 30, 1983, CEC sold to NIS additional upgrades (the Optional Upgrades) for the computers leased to Harris and ABC for $ 320,000. The purchase price was payable by cash in the amount of $ 40,500 and the balance by nonrecourse promissory note. NIS executed a nonrecourse promissory note (the NIS Second Replacement Note) dated December 30, 1983, payable to CEC in the amount of $ 21,518,268, which superseded the NIS Replacement Note. Under the NIS Second Replacement Note, payments were due by NIS to CEC as follows: February 29, 1984
$ 1,231,684.27
23 Quarter Payments
beginning May 31, 1984
in the amount of
$ 1,322,911.70
At the same time, NIS sold the Optional Upgrades to the Trust for $ 320,000, payable by $ 40,500 in cash and the balance by promissory note. The Trust thereby executed a "nonrecourse" promissory note (the Trust Second Replacement Note) *99 dated December 30, 1983, payable to NIS in the amount of $ 21,519,537 and maturing November 30, 1989, which superseded the Trust Replacement Note. Pursuant to the Trust Second Replacement Note, payments were due by the Trust to NIS as follows: February 29, 1984
$ 1,232,638.84
23 Quarterly payments
beginning May 31, 1984,
each in the amount of
1,323,862.10
Except for the amounts of payments due, the terms of the Trust Second Replacement Note were the same as those of the Trust note. Pursuant to a Second Amendment to Lease dated December 30, 1983, the Trust leased the Optional Upgrades to CEC. The Fixed Rent payable under the Main Lease by CEC to the Trust was increased as follows: Quarter 5
$ 1,232,638.84
Quarters 6 through 28,
each in the amount of
1,323,862.10
After the closing of the Trust's purchase of the initial equipment in 1982, Kidder Peabody provided the services of Short to assist CEC, NIS, and the Trust in keeping track of the various payments due. During the years 1983, 1984, and 1985, several weeks before each payment date, Short prepared a memorandum of the amount due by each party in the transaction. Short then *100 spoke to a representative of each party to verify that his memorandum had been received and understood, and that the payment would be made. All of the payments were effected by wire transfer. Short stopped issuing the memoranda after 1985. During 1986 and 1987, none of the payments due on the Main Lease, the Trust Second Replacement Note, and the NIS Second Replacement Note were made. On December 30, 1987, after this case was set for trial, CEC paid to the Trust the past due Main Lease payments for 1986 and 1987; the Trust paid to NIS the past due installments on the Trust Second Replacement Note for 1986 and 1987; and NIS paid to CEC the past due installments on the NIS Second Replacement Note for 1986 and 1987. None of the parties to the transactions requested or paid additional interest or late penalties in connection with the late payments. Tax Treatment
On his 1982 return, petitioner claimed depreciation on the computer equipment of $ 32,897.37 and interest and operating expenses in the amounts of $ 2,324.71 and $242.88, respectively, for a net loss of $ 35,464.96. Petitioner computed his depreciation deduction in issue using a recovery period of 5 years and a *101 basis in the equipment of $ 219,315.78. Petitioner also claimed an investment tax credit of $ 22,028.38, reporting a basis in the equipment for investment credit purposes of $ 220,283. OPINION I The first issue for decision is whether petitioner is entitled to a loss in 1982 with respect to the Trust's equipment leasing activity, and if so, to what extent. Respondent argues that the loss should be disallowed entirely because (1) the sale and leaseback transactions at issue were shams devoid of economic substance, (2) the Trust did not acquire the benefits and burdens of ownership with respect to the computer equipment and cannot be considered the owner for tax purposes, and (3) petitioner did not enter into the investment with the objective of making an economic profit. Alternatively, respondent argues that petitioner's losses are limited by the at-risk provisions of section 465. Respondent first raised these arguments in either his amended answer or trial memorandum. [2] He thus bears the burden of proof as to these allegations. Rule 142(a), Tax Court Rules of Practice and Procedure; Larsen v. Commissioner,89 T.C. 1229, 1251 (1987); Torres v. Commissioner,88 T.C. 702, 718 (1987). *102 Sham Transaction
We first address whether the form of the transaction should be respected or whether its substance requires that it be treated differently for Federal income tax purposes. While we do not hesitate to require transactions to be taxed in accordance with their true nature, the form given a transaction by the parties will be respected where: there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued *103 with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached * * * [Frank Lyon Co. v. United States,435 U.S. 561, 583-584 (1978).] In such cases, "the Government should honor the allocation of rights and duties effectuated by the parties." Frank Lyon Co. v. United States,435 U.S. 561, 584 (1978). In the context of a sale and leaseback transaction, the transaction is disregarded for Federal income tax purposes if it is determined "that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists." Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 91 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983); Levy v. Commissioner,91 T.C. 838, 854 (1988). Based on this standard, a determination that the transaction is an economic sham is inappropriate if either a business purpose or a reasonable possibility of profit, apart from expected tax benefits, is found *104 to have been present. Torres v. Commissioner,88 T.C. at 718. Prefatorily, respondent contends that the transaction does not qualify as a "genuine multiple-party transaction" under Frank Lyon Co. Respondent asserts that NIS was inserted into the transaction merely to create the appearance of a multiple-party transaction. We address this point at length subsequently in this opinion and agree with respondent that NIS's participation served no business purpose. Nevertheless, we agree with petitioner that, while the presence of multiple parties is a factor in determining economic substance, it is not essential. See Bussing v. Commissioner,88 T.C. 449 (1987), supplemental opinion 89 T.C. 1050 (1987); Mukerji v. Commissioner,87 T.C. 926 (1986). We are satisfied that objectively there was a reasonable possibility that the Trust's leasing activity would be profitable. Prior to selling units in the Trust, Kidder Peabody projected that an investor could realistically expect to earn an economic profit apart from tax benefits. The projections were based on Greco's appraisal of the fair market value of the equipment *105 around the time of purchase, the expected residual values as of January 1, 1987, and January 1, 1989, and the expected re-lease rentals following the expiration of the end-user leases. It is undisputed that the Trust purchased the computer equipment for its fair market value. At trial, three expert witnesses offered their opinions as to the residual value of the equipment. Petitioner called Greco as well as Robert A. Jones of Arthur D. Little Evaluations, Inc., who essentially corroborated Greco's conclusions. Greco testified that the projected re-lease rentals in the 1982 appraisal were based in part on the projected residual values. Respondent called S. Paul Blumenthal (Blumenthal), a senior vice president and appraiser of computer equipment for American Computer Group, Inc. Although Blumenthal's projections of the equipment's residual value were lower than Greco's, he admitted at trial that Greco's projections "were well within the realm of reasonability." Blumenthal did not discuss re-lease rentals in his pre-trial report and thus was precluded from testifying as to projected re-lease rentals pursuant to Rule 143(f), Tax Court Rules of Practice and Procedure.
Respondent *106 asserts that the 1982 IDC appraisal was too inaccurate and unreliable to be a basis for a reasonable possibility of profit from the transactions because (1) IDC projected the residual values of the equipment as of dates long before the equipment could actually be resold under the terms of the end-user leases and the Main Lease, and (2) the appraisal contains no explanation of methodology for the re-lease forecasts in the 1982 report. The IDC appraisal, like the others, is not without infirmities. The dates for which Greco appraised the equipment's residual value (January 1, 1987, and January 1, 1989) preceded the expiration of the end-user leases (certain dates between April 1987 and March 1988) and the Main Lease (December 1989) by several months. Nevertheless, we are not persuaded that a more precise appraisal would have materially diminished the likelihood of economic profit with respect to this investment. Thus, we cannot conclude that the transaction was devoid of economic substance. Benefits and Burdens of Ownership
Whether the benefits and burdens of ownership passed is a question of fact that must be ascertained in light of all of the relevant facts and circumstances. *107 Levy v. Commissioner,91 T.C. 838, 859 (1988); Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237 (1981). In the equipment purchase and leaseback context, the following facts are relevant to determining whether a sale has occurred: (1) the potential for realizing a profit or loss on the sale or re-lease of the equipment; (2) the payment of fair market value for the equipment; (3) a useful life of the equipment that extends beyond the lease term; (4) the investor's initial equity interest in the equipment as a percentage of the purchase price; (5) lease renewal or purchase options at the end of the lease term based on fair market value of the equipment at that time; (6) whether the projected residual value of the equipment plus the cash flow generated by the rental of the equipment allows the investors to recoup at least their initial cash investment; (7) whether at some point a "turnaround" is reached whereby depreciation and interest deductions are less than income received from the lease; and (8) whether the net tax savings for the investors are less than their initial cash investment. Levy v. Commissioner,91 T.C. at 860; *108 Torres v. Commissioner,88 T.C. at 721. We generally consider as neutral factors in this context: (1) the use of a net lease; (2) the absence of significant positive net cash flow during the lease term; and (3) the fact that the rental income stream during the initial lease term is tailored to or matches interest and debt payments that are due. Larsen v. Commissioner,89 T.C. 1229, 1267 (1987); Estate of Thomas v. Commissioner,84 T.C. 412, 433-438 (1985). We have already concluded that the Trust had a reasonable possibility of realizing a profit on the sale or re-lease of the equipment. Our determinations in connection with the economic substance of the transactions also lead us to conclude that the projected useful life of the property extended beyond the term of the leaseback, that the projected residual value of the equipment plus the cash flow generated by the rental of the equipment would allow each investor to recoup the initial cash investment, and that a turnaround would ultimately be reached whereby rental income would exceed allowable deductions. Moreover, the parties agree that the Trust purchased the equipment for *109 its fair market value. Respondent argues that CEC was the true owner of the equipment for tax purposes because (1) CEC held a right of substitution under the Main Lease with respect to the equipment, (2) the Trust could not sell the equipment without the written consent of CEC, and (3) the Main Lease was a net lease and thus shifted the risk of loss to CEC. Respondent's arguments are unpersuasive on the evidence of this case. Generally, we have not regarded the right of substitution in computer equipment leasing cases as indicative of a lack of ownership for tax purposes. See, e.g., Torres v. Commissioner,88 T.C. 702 (1987). Sun Oil Co. v. Commissioner,562 F.2d 258 (3d Cir. 1977), relied on by respondent, involved a lessee's right of substitution with respect to certain unimproved service station sites, i.e., unique property. The equipment in issue here, by contrast, is fungible. Respondent's assertion with respect to CEC's consent to sell ignores that CEC and the Trust each had to get the written consent of the other before selling or encumbering the equipment. Respondent has not proven that the Trust did not acquire the sufficient benefits *110 and burdens of ownership to be recognized as the owner of the equipment for tax purposes. Profit Objective
Section 183(a) provides that "if * * * [an] activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." A determination of whether the requisite profit objective exists is to be made on the basis of all the surrounding facts and circumstances of the case. Section 1.183-2(b), Income Tax Regs. The expectation of realizing a profit need not be a reasonable one, but there must be an actual and honest profit objective. Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Respondent argues that petitioner did not invest in the Trust with an actual and honest profit objective. In support of his arguments, respondent asserts that, although petitioner was experienced in equipment leasing, he lacked expertise in main frame computer leasing activities and spent no time in carrying on the activity. We are not persuaded by respondent's arguments. Section 183 does not require the level of business expertise *111 that respondent suggests. In view of the use of a net lease in the transactions, petitioner's failure to spend time with the leasing activity does not establish a lack of profit objective. The Trust entered into the transactions following Kidder Peabody's extensive analysis of the economics of the transaction and its negotiation with CAI of the leaseback terms. Petitioner obtained, reviewed, and understood the Private Placement Memorandum, the terms of the agreements, and the profit projections. He was experienced and apparently successful in other equipment leasing activity. The preponderance of the evidence does not negate an actual and honest profit objective of petitioner or the Trust. Amount At Risk
Respondent argues that, if the transactions had economic substance, passed the benefits and burdens of ownership to the Trust, and were entered into for profit, petitioner's loss is nonetheless limited by section 465 because petitioner was not at risk with respect to the Trust note. Respondent first asserts that the Trust note was not genuine indebtedness because NIS had no substance in the transactions and must be disregarded. Second, respondent asserts that, because *112 the real lender to the Trust was CEC, the Trust note was substantively owed to a party which had an interest in the activity other than as a creditor. Third, respondent asserts that petitioner was protected against loss with respect to the Trust note. Section 465 provides that, where an individual invests in certain activities, including the leasing of section 1245 property, any loss from such an investment shall be allowed only to the extent that the taxpayer is at risk with respect to the activity at the close of the taxable year. Section 465(a)(1); section 465(c)(1)(C). Borrowed amounts are considered to be at risk where, among other requirements, the amounts have been borrowed for use in the activity, and the taxpayer is personally liable for the repayment of the borrowed amounts or has pledged property, other than property used in the activity, as security for the borrowed amounts. Section 465(b)(2). Borrowed amounts are not at risk, however, insofar as such amounts are protected against loss through "nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." Section 465(b)(4). As stated in Levy v. Commissioner,91 T.C. at 863: *113 With respect to particular debt obligations, investors will be regarded as personally liable for such obligations within the meaning of section 465(b)(2)(A) if they are ultimately, economically liable to repay the obligations in the event funds from the investment activities are not available to repay the obligations. The critical inquiry is who is the obligor of last resort, and "the scenario that controls is the worst case scenario, not the best case." The fact that other investors or entities remain in the "chain of liability" does not detract from the at-risk amount of investors who have the ultimate liability. In determining which investors are ultimately financially responsible for the obligations, the substance of the transactions controls. Melvin v. Commissioner,88 T.C. 63, 75 (1987), on appeal (9th Cir., Aug. 7, 1987) * * * Respondent relies on Bussing v. Commissioner,88 T.C. 449 (1987), supplemental opinion 89 T.C. 1050 (1987), for the assertion that the Trust note was invalid for tax purposes. If the note is not valid, petitioner's interest deduction will be disallowed to the extent not actually paid. Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89 (4th Cir. 1985), *114 affg. in part and revg. in part 81 T.C. 1984 (1983); Rose v. Commissioner,88 T.C. 386 (1987), on appeal (6th Cir., Dec. 14, 1987). A distinction must be made, of course, between a substantively nonrecourse note, the interest on which may be deductible notwithstanding the protection against personal liability, and an illusory note for tax purposes. Bussing v. Commissioner, supra, involved a wraparound lease transaction structured similarly to the transaction in issue. In Bussing, the original owner sold certain computer equipment, then on lease to end-users, to an intermediate party, which simultaneously sold the equipment to a group of investors, including the taxpayer. The investors then leased the equipment back to the original owner. We determined that the intermediate party was inserted merely to satisfy the at-risk provision of section 465 and served no valid business purpose. In determining the substance of the leasing transaction between the taxpayer and the lessee, we thus disregarded the participation of the intermediate party. We further determined that the taxpayer's long-term promissory note did not represent valid indebtedness *115 for tax purposes. For this reason, we ultimately concluded that the taxpayer was not at risk to the extent of the long-term note. We indicated in the supplemental opinion that our disregarding the intermediate party was intertwined with our determination that the taxpayer's purchase note was not valid indebtedness for tax purposes. Bussing v. Commissioner, 89 T.C. at 1056. We commented, however, that the long-term note was not genuine because (1) after closing, the intermediate party disappeared entirely from the transaction; (2) the respective obligations between the lessee, which we determined to be the true lenders, and the taxpayer canceled each other out; (3) there was no evidence that any payments on the note were ever made; and (4) in the event of a default by the lessee under the lease, the taxpayer's principal obligation under his note was deferred until approximately 12 years after issuance of the long-term note. In view of all of the evidence, we do not believe that NIS's participation served any valid business purpose. Crouse of CAI initially proposed that the equipment be sold directly to Kidder Peabody. Kidder Peabody, however, wanted to promote *116 the transaction for investors in the Trust and did not want to appear to be directly involved as a party in the sale-leaseback transaction. Kidder Peabody proposed instead that a subsidiary of CAI (CEC) sell the equipment to NIS and that NIS sell the equipment to the Trust. After the deal was arranged, Kidder Peabody prepared a summary of the transactions for its retail sales force, which summary clearly and explicitly stated that the exclusive role of NIS was to give substance to the Trust's putative recourse financing for tax purposes. At trial Seplow unpersuasively attempted to explain away this document by stating that "it was appropriate to have a sale of equipment * * * through an intermediary" and that he "felt it was essential to have a substantial independent company in the transaction * * *." Seplow gave no credible nontax-motivated purpose, however, for NIS in this transaction. The very terms of the agreements covering the transactions suggest NIS's participation was not compelled by business reasons. The NIS note was nonrecourse. The terms of the NIS Purchase Agreement allowed the Trust to cure any default of NIS under the NIS note. If the Trust did not cure the *117 default, CEC was entitled to apply the rent otherwise owed to the Trust against the amounts owed to it by NIS. Further, NIS had no involvement in negotiating the terms of the transaction. NIS's function in the transactions was nothing more than "window dressing" to enable the Trust investors to avoid the at-risk provisions of section 465 and to make the transaction appear to be a genuine multiple-party transaction for purposes of applying Frank Lyon Co. v. United States,435 U.S. 561 (1978). We disagree, however, with respondent's assertion that, by virtue of Bussing, the Trust note was invalid for tax purposes merely because NIS served no business purpose in the transaction. Although in that case our disregard of the intermediate party and our determination that the note at issue was not genuine for tax purposes were intertwined, we nonetheless looked to all the facts and circumstances surrounding the note before concluding that the note was not genuine. The preponderance of the evidence here, unlike in Bussing, does not establish that the Trust note was not genuine for tax purposes. The Trust purchased the equipment at its fair market value. Under *118 the terms of the secured Trust note, it was unconditionally responsible for timely quarterly payments on the indebtedness, i.e., it was liable whether CEC paid its quarterly rent or defaulted. The Trust respected the formalities of its note through 1985. While the cessation of installment payments during 1986 and 1987 without apparent business reason is troublesome, that alone does not render the note not genuine. Accord Packard v. Commissioner,85 T.C. 397, 421-422, 427-428 (1985). This is a close case, but respondent fails to satisfy his burden of proof on this matter. We agree with respondent, however, that petitioner was protected against loss with respect to the Trust note. When viewed together, the terms of the various documents of the sale-leaseback transaction indicate that petitioner was guaranteed from having to pay any portion of the Trust note, notwithstanding its ostensible recourse provisions. The Trust note stated that each owner-beneficiary of the Trust would be personally liable for a fractional share of the payments due under the Trust note, as and when such payments would become due. In the event of the Trust's default, however, the Trust *119 note required NIS to proceed against the equipment and all rents and other proceeds therefrom prior to exercising any other right or remedy. The quarterly rental payments due under the Main Lease equaled or exceeded the quarterly installments due under the Trust note for the note's entire duration, except for the Trust's prepayment of interest for 1982 and 1983 due at closing on December 1, 1982. In the worst scenario, CEC would breach its obligations under the Main Lease, rendering the collateral (the equipment only) possibly insufficient to satisfy the Trust's obligations under the Trust note. In this event, however, the Trust would have a claim against CAI pursuant to CAI's absolute and unconditional guarantee of all rental payments due under the Main Lease. By enforcement of the Guaranty, the collateral (the equipment and rental payments) was certain to equal or exceed in value the amount of the Trust's obligations for the duration of the Trust note. The Trust beneficiaries thus were not the obligors of last resort. There was no apparent business purpose for the putative recourse liability of the Trust note, and petitioner does not suggest one. CAI originally purchased *120 the equipment with cash and a nonrecourse note. It assigned the equipment to its subsidiary CEC, which sold the equipment to NIS for cash and a nonrecourse note. The indebtedness underlying the Trust note thus was nonrecourse. Furthermore, it is significant that the Trust replacement notes, issued approximately 1 year after the Trust note and containing the same personal liability language, were labeled "nonrecourse." Petitioner argues that the Guaranty of CAI should not be considered a "guarantee" within the meaning of section 465(b)(4). According to petitioner, the clear purpose of the CAI Guaranty was to place the parties in the same position as if the Main Lease had been entered into between the Trust and CAI, being the parent of CEC, directly. Petitioner contends that, had that been done, the Main Lease would not be considered to constitute a "guarantee" and cites Gefen v. Commissioner,87 T.C. 1471, 1503 (1986). Petitioner asserts that the result should be no different where the lease is entered into by the subsidiary and guaranteed by the parent. Petitioner does not assert that the Guaranty was invalid under New York law. In deciding the tax consequences *121 of this transaction, we can only consider how the transaction was structured, not how it might have been. Corporate law generally recognizes separate legal identities for the parent corporation and subsidiary, each responsible for its own debts even though both are part of a single business enterprise. Likewise, jurisdictions widely sanction the parent corporation's guarantee of its subsidiary's obligations, a credit device deemed to be in furtherance of the parent corporation's purposes because of its stock ownership. E.g., N.Y. Bus. Corp. Law sec. 202(a)(7) (McKinney 1988); Chester Airport, Inc. v. Aeroflex Corp.,37 Misc.2d 145, 237 N.Y.S.2d 752 (Sup. Ct. 1962), modified 18 App. Div.2d 998, 238 N.Y.S.2d 715 (1963). Thus, for purposes of applying section 465(b)(4), there is no reason for distinguishing a valid guarantee where the guarantor and principal debtor are parent corporation and subsidiary from one where the guarantor and principal debtor are not related. Petitioner argues that the appropriate scenario for deciding the amount of his personal economic exposure under the Trust note is the possible bankruptcy of NIS. *122 Petitioner contends that the bankruptcy trustee would have the duty, pursuant to 11 U.S.C. sec. 704(1) [3] (1982), to enforce the Trust note against the Trust and its beneficiaries. Petitioner alternatively argues that if the Court decides that the participation of NIS should be disregarded, then CEC and/or CAI is the "real lender" in this transaction by virtue of Bussing v. Commissioner,88 T.C. 449 (1987), supplemental opinion 89 T.C. 1050 (1987); thus, if CEC and/or CAI were to file a petition in bankruptcy, the bankruptcy trustee could disavow the Main Lease under 11 U.S.C. sec. 365(a) [4] (1982) and still enforce the Trust note against the Trust and its beneficiaries. Consequently, petitioner would be personally liable for his share of the debt service payments without the benefit of the corresponding Main Lease rental payments. *123 There are three serious weaknesses in petitioner's arguments. First, while a bankruptcy trustee has the duty to assert all claims of the estate arising from the estate's contracts, such contracts remain enforceable only pursuant to their terms. Thus, under the scenarios presented by petitioner, the bankruptcy trustee would stand in no better position to enforce the Trust note against the Trust beneficiaries than NIS would under normal circumstances. As previously discussed, such enforcement would entail proceeding against the guaranteed collateral. Second, it is not apparent that CEC, CAI, or their bankruptcy trustees would even have standing to sue the Trust beneficiaries under the Trust note. Petitioner assumes that if we treat CEC or CAI as the "real lender" in this transaction for tax law purposes, we must deem CEC or CAI as capable of enforcing the Trust note under contract law. This assumption is incorrect. Neither CEC nor CAI had privity of contract with the Trust under the Trust note, and there is no evidence that any rights thereunder were assigned to them. The Trust note did require NIS to use all installments received from the Trust to pay its obligations to CEC *124 under the NIS note. Assuming arguendo that CEC was an intended beneficiary under the Trust note, there is still no evidence that the Trust and NIS contemplated benefiting CEC any more than what CEC would be entitled to receive under the nonrecourse NIS note, i.e., the value of the equipment. Third, we do not believe that Congress intended the insolvency of the guarantor (CAI) to be considered in determining whether the taxpayer was protected against loss. When section 465 was promulgated, Congress commented on the application of the at-risk rules to section 464 as follows: <7>For purposes of this rule, it will be assumed that a loss-protection guarantee, repurchase agreement or insurance policy will be fully honored and that the amounts due thereunder will be fully paid to the taxpayer. The possibility that the party making the guarantee to the taxpayer, or that a partnership which agrees to repurchase a partner's interest at an agreed price, will fail to carry out the agreement (because of factors such as insolvency or other financial difficulty) is not to be material unless and until the time when the taxpayer becomes unconditionally entitled to payment and, at that time, *125 demonstrates that he cannot recover under the agreement. [H. Rept. No. 94-658 (1975), 1976-3 C.B. (Part 4) at 801.] We conclude that petitioner was not at risk with respect to his share of the Trust note. II Section 6653(a) provides that an addition to tax shall be imposed if any part of an underpayment is due to negligence or intentional disregard of rules and regulations. Generally, the duty of filing accurate returns cannot be avoided by placing responsibility on an agent, Pritchett v. Commissioner,63 T.C. 149, 174 (1974); however, reasonable reliance on the advice of an expert suffices to avoid the addition for negligence. Industrial Valley Bank & Trust Co. v. Commissioner,66 T.C. 272, 283 (1976). Petitioner bears the burden of proving that respondent's determination of the additions to tax is erroneous. Neely v. Commissioner,85 T.C. 934, 947-948 (1985). Petitioner conceded at trial that he was not entitled to the investment tax credit claimed on his 1982 return with respect to the transaction at issue. Petitioner contends that the section 6653(a) addition does not apply because he relied on his accountant *126 to prepare his return and the accountant erred. We do not believe that petitioner's reliance on the accountant's advice in this instance could have been reasonable or in good faith. Petitioner has urged us to find, and we did, that he reviewed and understood the Private Placement Memorandum, a finding which supported petitioner's positions with respect to other issues in this case. The Private Placement Memorandum explicitly stated that no investment credit would be allowed for this transaction. Accordingly, petitioner must have also understood that no credit would be allowed. There is no evidence that he ever questioned the accountant's judgment in claiming the credit. We sustain respondent's determination in connection with this addition. We do not sustain the addition to tax under section 6659 because we have not concluded that any portion of petitioner's underpayment is attributable to a valuation overstatement. Section 6661(a) imposes an addition to tax for substantial understatements of income tax. This addition is normally not applicable to the extent the tax treatment of an item is supported by substantial authority. Section 6661(b)(2)(B)(i). Petitioner maintains *127 that he is not subject to section 6661 because the authority supporting his tax treatment of his investment was substantial. With respect to the at-risk issue, petitioner contends that "a well-reasoned construction of Section 465" and the cases of Mukerji v. Commissioner,87 T.C. 926 (1986), and Lansburgh v. Commissioner,T.C. Memo. 1987-491, constitute substantial authority. We disagree. Petitioner's tax treatment of this transaction does not comport with section 465(b)(4), as discussed above. Lansburgh is obviously distinguishable from this case on its facts. The relevant question there was whether the taxpayer was at risk with respect to promissory notes which, by their terms, converted upon passage of time from recourse to nonrecourse. The Commissioner alleged unsuccessfully that the potential tax deductions of the transaction at issue constituted a "guarantee" or "other similar arrangement," protecting the taxpayer against loss on his promissory notes while they were recourse. The guarantee in this case, by contrast, was not merely an economic one, but one created under New York law. In Mukerji, we did not even discuss the amount *128 at which the taxpayer was at risk on his investment. Thus, to the extent petitioner's understatement constitutes a substantial understatement under section 6661(b), this addition should be imposed. Antonides v. Commissioner,91 T.C. 686, 702-703 (1988). Finally, the increased rate of interest under section 6621(c) applies here to the underpayment attributable to that portion of the loss disallowed by section 465(a). Section 6621(c)(3)(A)(ii). Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect during the year in issue. * 50 percent of the interest due on $ 38,978.58. ** 10 percent of the understatement of $ 38,978.58. *** 120 percent of the interest accruing after December 31, 1984, on the entire underpayment of tax.↩
2. In his notice of deficiency, respondent determined that petitioner was not entitled to a depreciation deduction because "it has not been established that this constitutes an ordinary and necessary business expense or was substantiated pursuant to section 167." Respondent determined that petitioner was not entitled to either an interest expense or an operating expense deduction because "it has not been established that * * * [the respective] amount constitutes an ordinary and necessary business expense, was expended, was expended for the designated purpose, or was substantiated pursuant to Section 274." Respondent did not rely on these theories at trial or on brief.↩
3. Sec. 704. Duties of trustee. The trustee shall -- (1) collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest; ↩
4. Sec. 365. Executory contracts and unexpired leases. (a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.↩