MICHAEL BRADY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Brady v. Commissioner
Docket No. 10287-88
United States Tax Court
T.C. Memo 1990-626; 1990 Tax Ct. Memo LEXIS 712; 60 T.C.M. (CCH) 1415; T.C.M. (RIA) 90626; December 12, 1990, Filed Decision will be entered for petitioner. Petitioner purchased computer equipment and leased the equipment back to the seller who previously leased the equipment to an end user. Held: Petitioner is at risk within the meaning of sec. 465, with respect to debt obligations associated with the transaction. John J. Eagan, for the petitioner. Arthur Yellin and Robert Saal, for the respondent. WHITTAKER, Judge. WHITTAKER
*2041 MEMORANDUM OPINION This case was submitted fully stipulated pursuant to Rule 122; [1] the stipulation of facts and exhibits attached thereto are incorporated herein by this reference. However, many of the facts set forth herein are based upon our examination of the exhibits and were not set out in the stipulation. Respondent determined deficiencies in and additions to petitioner's Federal income tax as follows: Increased Interest and
Additions to Tax
Year
Deficiencies
Section 6621(c)
Section 6661 1982
$ 14,585
*
$ 3,646
1983
11,993
*
2,998
1984
31,744
*
7,936
1985
18,729
*
4,682
*716 After concessions and by stipulation, [2] the parties submitted for our consideration only the following: (1) Whether or not the payee of the notes is a person who has an interest in the activity other than as a creditor, within the meaning of section 465(b)(3)(A) and (B); (2) whether petitioner was protected against loss by reason of a "guarantee," within the meaning of section 465(b)(4); and (3) whether petitioner is liable for an addition to tax under section 6661 and increased interest under section 6621(c). As discussed below, we hold that the payee of the notes did not have an interest in the activity other than as a creditor and petitioner was not protected against loss by reason of a guarantee. Therefore, petitioner is not liable for any addition to tax under section 6661 or increased interest under section 6621(c). *717 Petitioner, Michael Brady, was a resident of Wyckoff, New Jersey, at the time his petition was filed. On December 30, 1982, petitioner purchased certain IBM computer equipment (Equipment) from DPF Computer Leasing Corporation (DPF). The purchase price for the Equipment was $ 262,313. Petitioner paid $ 6,500 in cash toward the purchase price. Petitioner issued a short-term note in the amount of $ 36,782 to DPF. The note required petitioner to pay DPF installments of $ 13,000, $ 20,000, and $ 12,001.01 on June 30, 1983, June 30, 1984, and June 30, 1985, respectively. The payments reflected principal with interest at 15 per cent per annum. The note required petitioner to deliver to DPF a transferable, irrevocable letter of credit issued by a bank providing for credit to be drawn in amounts and on dates sufficient to satisfy the short-term note. Respondent concedes that these payments were made when due. Petitioner issued a long-term note in the amount of $ 219,031 to DPF. The note required petitioner to pay DPF four payments of $ 19,712.79, representing interest only, on June 30, 1983, December 30, 1983, June 30, 1984, and December 30, 1984, and 14 semi-annual payments of *718 principal and interest in the amount of $ 23,564.43 commencing June 30, 1985, and ending December 29, 1991. The parties agree that both notes are recourse obligations. DPF is a wholly owned subsidiary of Stratford. When formed, DPF had substantial liabilities and no significant net worth. DPF financed the acquisition of the Equipment with loans from one or more financial institutions. The Equipment was pledged as collateral for these loans. DPF had sole responsibility for payments on these loans. Petitioner purchased the Equipment subject to the existing liens, but was not personally liable for the obligations on those liens. If DPF failed to make the required payments on these loans, the financial institutions that financed the Equipment had the right to foreclose upon the Equipment. At the time of purchase, the Equipment was subject to a Master Lease of not less than 3 years between DPF and General Motors Acceptance Corporation (GMAC). Petitioner acquired the Equipment subject to the Master Lease. Petitioner did not have any rights nor did petitioner assume any obligations of DPF under the Master Lease or any subsequent leases entered into by DPF. Simultaneously, petitioner *719 leased the Equipment back to DPF pursuant to an Owner Lease. The Owner Lease commenced on December 30, 1982, and will terminate on December 29, 1991. Pursuant to the Owner Lease, DPF was *2042 required to pay fixed rental payments and additional rental payments to petitioner. The fixed rental payments consisted of 4 semi-annual payments of $ 19,712.79 commencing June 30, 1983, and ending December 30, 1984, and 14 semi-annual payments of $ 23,564.43 commencing June 30, 1985, and ending December 29, 1991. The additional rental payments were an amount by which 55 percent of the amount of the sublease rentals actually received by DPF, commencing June 1, 1986, exceeded the sum of all costs of brokerage in connection with obtaining the sublease from which such sublease rentals derive, and an agreed-upon freight and refurbishment fee of 2 percent of the total amount of the sublease rentals provided to be paid by the sublessee over the term of such sublease, commencing June 1, 1986. There was no assurance that petitioner would receive any additional rental payments. A default by DPF under the Owner Lease would have no effect on petitioner's obligation to make payments to DPF under the short-term *720 and long-term notes. Petitioner was personally liable for repayment of the short-term and long-term notes. If the payments on the notes were not made, DPF or any transferee of the notes would have full recourse against petitioner. As security for the payment of the short-term and long-term notes, petitioner granted DPF a continuing security interest in petitioner's rights to: (i) the Owner Lease, (ii) all rental payments and other amounts payable under the Owner Lease by DPF, (iii) the Equipment Purchase Agreement; (iv) the Equipment; and (v) all proceeds of the foregoing. If petitioner failed to make payments on the notes, DPF could demand payment in full. DPF assigned its rights in the foregoing collateral to the Stratford Group Ltd. (Stratford) as a condition precedent for Stratford entering into the guaranty agreement described below. Petitioner and Stratford entered into a guaranty agreement (Stratford Guaranty) on December 30, 1982. Pursuant to the agreement, Stratford guaranteed to pay petitioner the fixed rental payments if DPF failed to make the rental payments when due. Delivery of the Stratford Guaranty was conditioned upon the assignment to Stratford of the security *721 interest held by DPF. Also pursuant to the agreement, if DPF failed to make the rental payments to petitioner when due, petitioner's payments on the notes would be made directly to Stratford. The Stratford Guaranty also provided that if petitioner failed to make the payments on the note when due, Stratford was not obligated to pay the rental payments, unless and until the note payments were paid. Upon expiration of the initial sublease with GMAC, DPF was entitled to re-lease the equipment without petitioner's permission. Upon the termination of the Owner Lease, petitioner was under no obligation to retain DPF to re-lease or sell the Equipment. Petitioner was entitled to remarket the Equipment himself, retain DPF, or retain any other person to remarket the equipment. Petitioner claimed deductions attributable to his investment in the IBM computer equipment on his Federal income tax returns for the years 1982 through 1985. On April 13, 1988, respondent mailed a statutory notice of deficiency to petitioner. Respondent determined that petitioner was not at risk with respect to amounts paid with the short-term and long-term notes to acquire the Equipment. In the notice of deficiency *722 respondent disallowed all deductions for depreciation and interest expenses, and excluded the rental income in computing the deficiency for the years in issue. Respondent concedes that petitioner is at risk with respect to the $ 6,500 cash contributed to the activity. Respondent concedes that petitioner's investment in the computer leasing equipment was an activity entered into for profit, had economic substance, and that petitioner had the benefits and burdens of ownership. Section 465 provides that, where an individual invests in certain activities including the leasing of section 1245 property, any loss from such activity for the taxable year shall be allowed only to the extent that the taxpayer is at risk with respect to amounts contributed or borrowed (within the meaning of section 465(b)(2)) by the taxpayer for use in such activity at the close of the taxable year. Secs. 465(a)(1), 465(b), and 465(c)(1)(C). The parties agree that the computer equipment is section 1245 property and that the leasing of the computer equipment is included within the activities covered by the at-risk *723 provisions. A taxpayer is considered at risk with respect to the amounts of money contributed by the taxpayer to the activity. Sec. 465(b)(1)(A). The parties agree that petitioner is at risk with respect to the $ 6,500 cash which petitioner contributed to the activity. A taxpayer is also considered at risk with respect to amounts borrowed for use in the activity only to the extent that the taxpayer is personally liable for the repayment of such amounts, or has pledged property, other than property used in such activity, as security for such borrowed amount. Secs. 465(b)(1)(B) and 465(b)(2). Section 465 imposes two further requirements with respect to borrowed amounts for use in an activity. Section 465(b)(3) provides that a taxpayer is not considered at risk with respect to amounts borrowed for use in an activity if such *2043 amounts are borrowed from any person who has an interest other than an interest as a creditor in such activity. And section 465(b)(4) provides that a taxpayer is not considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements. Petitioner bears the burden *724 of proof on the at-risk issues. Rule 142(a). In Jackson v. Commissioner, 86 T.C. 492, 529 (1986), affd. 864 F.2d 1521 (10th Cir. 1989), we held that the requisite interest other than as a creditor must be either a capital interest in the activity, or an interest in the net profits of the activity. This Court has applied this analysis in later cases. Levy v. Commissioner, 91 T.C. 838, 868 (1988); Larsen v. Commissioner, 89 T.C. 1229, 1270 (1987), affd. in part and revd. on another issue sub nom. Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990); Bennion v. Commissioner, 88 T.C. 684, 698 (1987). In these cases, we defined a capital interest as an interest in the assets of the activity which is distributable to the owner of the capital interest upon liquidation of the activity. In analyzing the issue before us we must also look to the policy underlying section 465(b)(3)(A). In Bennion, we stated that the policy underlying section 465(b)(3)(A) is: to exclude from at-risk *725 amounts those amounts that are borrowed from creditors who, because of the nature of their continuing other interests in the activity, would not be likely to act as independent creditors with respect to the debt owed to them. * * * Creditors who hold recourse obligations, but who also have certain other interests in the activity, might disregard their rights thereunder in favor of protecting or enhancing their other interests in the activity. In light of that eventuality and in spite of the otherwise recourse nature of the debt, taxpayers who owe recourse debt obligations to such creditors are not to be regarded as at risk with respect thereto. [Bennion v. Commissioner, supra at 697-698. Citations omitted.] Respondent argues that petitioner is not at risk within the meaning of section 465 with respect to his debt obligations relating to the Equipment because DPF has both a capital interest and net profits interest in the activity. Respondent contends that DPF's involvement in the transaction is overriding. According to respondent, DPF's interest as a lessee under the Owner Lease, as lessor under the Master Lease, and DPF's interest in the income from *726 the subleases give DPF a substantial financial interest in the activity and constitute prohibited capital interests. Respondent also argues when DPF renews the lease with GMAC or re-leases the Equipment to another end user in order to repay the debt DPF incurred in the original acquisition of the Equipment, the additional rental provision is triggered, which provides DPF with a continuing capital interest in the activity. Petitioner contends that he should be considered at risk for the full amount of his debt obligations to DPF arising out of his purchase of the Equipment from DPF. Petitioner claims that he is personally and ultimately liable on the debts to DPF, that he is not protected against loss with respect to the obligations by any guarantee, and that DPF does not have any continuing interest in the transaction other than as a creditor. Petitioner argues that none of the interests set forth by respondent constitute prohibited interests for purposes of section 465(b)(3). Petitioner is correct. As lessee under the Owner Lease, DPF is not entitled to share in any capital interest in the activity upon conclusion of the lease or upon liquidation of the activity. And as lessor *727 under the Master Lease, DPF does not have any interest in the assets of the activity upon liquidation. In Larsen v. Commissioner, supra at 1271, this Court decided that an agreement to share additional rental payments upon termination of the Owner Lease does not create a prohibited capital interest in the creditor. The additional rental provision in this case does not create a capital interest in DPF because DPF did not retain any capital interest in the assets of the activity which is distributable to the owner upon liquidation of the activity. We conclude that none of these interests, separately or combined, create a capital interest in DPF within the meaning of section 465(b)(3)(A). Respondent argues that DPF has a net profits interest in the activity because DPF will receive additional rental payments based on net profits. Respondent argues that DPF is responsible for all maintenance and risk of loss expenses under this arrangement and that DPF will receive 45 percent of the additional rental payments less these expenses. Therefore, respondent argues that *728 these payments are based on net profits, not gross profits. Petitioner argues that in this case, the additional rentals are based on gross rental proceeds, not net profits. Therefore, DPF does not have a net profits interest in the activity. The Court agrees with petitioner. The additional rental provision does not create a net profits interest in DPF. The Owner Lease provides that petitioner will receive additional rental payments from DPF if DPF rents the Equipment to an end user subsequent to the termination of the Master Lease with GMAC. *2044 The additional rental payments are based on gross receipts. DPF will pay petitioner 55 percent of the sublease rental payments less brokerage costs to obtain the sublease and less a freight and refurbishment fee. DPF will receive 45 percent of the sublease rental payments. There is no provision in the Owner Lease that provides that DPF will receive 45 percent of the sublease rental payments less costs. In Larsen v. Commissioner, supra, the Court decided that additional rental payments do not create an interest in net profits *729 where the additional rental payments are based upon gross receipts, not net proceeds. In this case, the payments are based on gross profits. Therefore, we conclude that DPF does not have a net profits interest in the activity. Respondent also argues that DPF and petitioner are involved in an arrangement that amounts to more than a remarketing agreement and should be considered a joint venture arrangement to share additional rental payments from the new subleases. Respondent argues that the facts in this case are similar to the facts in Bennion v. Commissioner, 88 T.C. at 684; Bussing v. Commissioner, 88 T.C. 449 (1987), and Waddell v. Commissioner, 86 T.C. 848 (1986), affd. 841 F.2d 264 (9th Cir. 1988). In Bennion, the Court decided that a remarketing agreement constituted an interest in the net profits of an activity and may violate section 465(b)(3). The creditor was a member of the joint venture which acquired the property. In Bussing, the Court decided that the parties were engaged in a joint venture to invest, lease, and market certain computer equipment. In Waddell, the Court decided that *730 the creditor had an interest in the activity other than as a creditor because the creditor would receive 55 percent of the profit from the activity based on net receipts. Petitioner argues that respondent's reliance on Bennion, Bussing, and Waddell is misplaced because the fact patterns are distinguishable from this case. Petitioner argues that the interests held by DPF resemble the facts in Levy and Larsen. Petitioner further argues that in order for DPF to have an interest in the activity other than as a creditor, DPF must be receiving the rental payments. Petitioner argues that it is petitioner who has an interest in DPF's leasing activities, not the reverse, because DPF is paying petitioner the additional rental payments. The facts in Bennion, Bussing, and Waddell are distinguishable from this case and, therefore, are not controlling. There is no evidence of a joint venture arrangement to share the additional rental payments between petitioner and DPF. The transaction is very similar to the facts in Levy and Larsen, in which the Court decided that the additional rental provision does not create an interest in the activity other than *731 as a creditor. For the reasons stated, we conclude that DPF's interest in the activity does not constitute a continuing prohibited capital or net profits interest in the transaction. Respondent asserts that Stratford's guaranty of the rental payments is a guarantee within the meaning of section 465(b)(4). Respondent contends that petitioner was protected against loss on the long-term note through a guarantee executed by Stratford. Respondent concedes that if the Court decides that petitioner is not at risk with respect to the notes for purposes of section 465(b)(3), petitioner will be at risk for the amounts paid on the notes at the time petitioner makes actual payments on the notes. If the Court decides that petitioner is at risk with respect to the notes for purposes of section 465(b)(3), then respondent concedes that petitioner is also at risk with respect to the short-term note for purposes of section 465(b)(4), regardless of the Court's decision with respect to the long-term note for purposes of section 465(b)(4). Labels do not control this analysis. The issue must be resolved on the basis of who realistically will be the payor of last resort if the transaction goes sour *732 and the secured property associated with the transaction is not adequate to pay off the debt. Levy v. Commissioner, 91 T.C. 838, 869 (1988). Petitioner argues that the agreement provides petitioner with an alternate source for the payment of rental income and nothing more. Petitioner asserts that in order for petitioner to be protected against loss, his default on the note should trigger the obligation of a third party to pay him the amount owed. In this case, a default by petitioner does not provide him with any third party payment. The rental guaranty applies only if DPF defaults. Therefore, petitioner is not protected by the rental guaranty if he defaults, which is required by section 465(b)(4). Petitioner also relies on the fact that this Court has held that when there are matched sale and leaseback payments, the fact that the leaseback payments represent the income source used to satisfy the promissory note obligation should not, in and of itself, disqualify the promissory note for at-risk purposes, citing Gefen v. Commissioner, 87 T.C. 1471 (1986). Petitioner argues that the rental payments whether made by DPF, or by Stratford pursuant *733 to a guarantee do not present an at-risk problem. Respondent attempts to distinguish the facts in Gefen from this case by arguing that the facts in Gefen involve a multi-party transaction, *2045 whereas the facts in this case involve a two-party transaction. Respondent argues that in a two-party transaction, a guarantee represents a serious at-risk problem. Respondent relies mainly on Van Roekel v. Commissioner, T.C. Memo. 1989-74, appeal dismissed and case remanded 905 F.2d 80 (5th Cir. 1990), to support his argument. Petitioner argues that Van Roekel is distinguishable from this case because the rights of the taxpayer in Van Roekel were different from those held by petitioner in this case. In addition, petitioner points out that the Court in the Van Roekel case considered the guaranty of the parent corporation in conjunction with offset rights held by a Trust to which the taxpayer was an owner-beneficiary. Petitioner maintains that the Stratford Guaranty, standing alone, does not violate section 465(b)(4). The facts in Van Roekel involved a purchase and leaseback transaction of computer equipment. Capital Associates International, *734 Inc. (CAI) purchased computer equipment for a combination of cash and nonrecourse financing through third-party lenders. CAI leased this equipment to various lessees or end users of the equipment. CAI assigned the equipment, subject to the end-user leases, to Capital Equipment Corporation (CEC), a wholly owned subsidiary of CAI. Kidder Peabody and Company (Kidder Peabody) was the intended purchaser of the equipment. Kidder Peabody, after the purchase, would lease the equipment back to CAI. To accomplish this part of the transaction, Kidder Peabody created NIS Corporation (NIS) and a Trust. The Trust was created for the purpose of acquiring, owning, leasing, and disposing of the equipment. The taxpayer in the case was an investor in the Trust. NIS was created to set up an arm's-length intermediate sale between CEC and the Trust so that the recourse to the investors on the Trust's financing would have substance for tax purposes. CEC sold the equipment to NIS subject to leases to end users and third-party financing. Then, NIS sold the equipment to the Trust, subject to the end-user leases and the obligations to CEC and third-party lenders. The Trust granted NIS a security *735 interest in the equipment and rents. If the Trust defaulted on payment of the note, NIS was required to proceed against the equipment and rents first. The Trust leased the equipment back to CEC. Under this lease, if NIS failed to make any installment payments when due under the NIS note, CEC had the option to set off, or defer, against its payment of rent to the Trust, the amount which NIS owed. CAI guaranteed CEC's performance of all obligations to the Trust. The Court in Van Roekel decided that the taxpayer was protected against loss with respect to the Trust note. The Court viewed the terms of the various documents together to find that the taxpayer was guaranteed from having to pay any portion of the Trust note, notwithstanding its recourse provisions. Under the Trust note, the taxpayer was personally liable for his share of the payments due under the Trust note. In the event of the Trust's default, the Trust note required NIS to proceed against the collateral under the security agreement prior to exercising any other remedy. The quarterly rental payment due under the Main Lease from CEC equaled or exceeded the payments due under the note. In the worst scenario, CEC *736 would breach its obligations under the Main Lease which would provide the Trust with a claim against CAI pursuant to the guarantee agreement. The rental payments equaled or exceeded the note payments. Therefore, the Court reasoned that the taxpayer was not the obligor of last resort. In Emershaw v. Commissioner, T.C. Memo. 1990-246, on appeal (6th Cir. Sept. 21, 1990), computer equipment was initially purchased by CIS Leasing Corporation (CIS). CIS leased the equipment to end users. Program Leasing Corporation (Program) purchased the equipment from CIS, subject to the leases of the end users and financing. Program sold the equipment to The Leasing Equipment Associates (LEA) subject to the leases to the end users and financing. LEA leased the equipment back to CIS, subject to the bank liens and leases to the end users, and Program's security interest. Continental Information System, CIS' parent, guaranteed CIS' rent obligation to LEA. LEA directed CIS to pay fixed rent payments due under the lease directly to Program and Program directed CIS to apply the foregoing payments against the installments due under the Program note. Respondent in Emershaw argued *737 that the taxpayer was protected against loss because the LEA monthly installments pursuant to the note equaled exactly the rental payments due from CIS pursuant to the lease. The Court rejected respondent's argument that the equality of payments constitutes an arrangement protecting the taxpayer from loss. The Court stated that "it is the obligor of last resort that is to be regarded as at risk under section 465. The fact that funds may be available from other sources to make payments on debt obligations does not detract from the liability of the debtor of last resort to make such payment if the funds are not forthcoming," citing Krause v. Commissioner, 92 T.C. 1003, 1024 (1989). The Court in Emershaw decided that the taxpayer was the obligor of last resort with respect to the note. The fact that the note might be amortized by lease payments from CIS and that *2046 the note might be satisfied in whole or in part through offsetting accounting entries rather than actual cash payments did not in and of itself change the fact, citing Gefen v. Commissioner, 87 T.C. at 1503. *738 Respondent in Emershaw also argued that CIS' corporate parent, Continental, guaranteed CIS' obligation to pay rent to LEA. The Court stated that: The guarantee, however, does not protect petitioner from ultimate liability for his pro rata share of the partial recourse note. Rather, the guarantee merely diminishes the possibility that LEA will be unable to collect the rent to which it is entitled under the lease. LEA remains the debtor of last resort with respect to the partial recourse note. * * * [Emershaw v. Commissioner, 59 T.C.M. 621, 631, 59 P-H Memo T.C. par. 90,246 at 1131.] We find the facts in this case to be closer to those in Emershaw. We believe that petitioner is not protected from loss by the Stratford Guaranty because the guarantee does not protect petitioner from ultimate liability for the long-term note. The guarantee merely diminishes the possibility that petitioner will be unable to collect the rent to which he is entitled. Petitioner remains the debtor of last resort with respect to the long-term note. Our position is further supported by the fact that the Stratford Guaranty provided that in the event petitioner failed *739 to make the payments under the long-term note, Stratford was not obligated to make further rental payments until petitioner made the payments on the long-term note. This fact distinguishes this case from Van Roekel in which the creditor had the option to set off, against its payment of the rent to the Trust, the amount which NIS owed. Our analysis of the record and particularly the documents in question leads us to conclude that petitioner was not protected against loss with respect to his debt obligation. Petitioner is not liable for any additions to tax under section 6661 or any increased interest under section 6621(c). Decision will be entered for petitioner. Footnotes
1. Unless otherwise noted, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue.↩
*. 120% of the interest due on the underpayment↩
2. Respondent concedes all arguments raised in the Notice of Deficiency except the at-risk arguments. Petitioner and respondent agreed by stipulation that there were two issues to be tried in this case, as noted in the opinion. Respondent raised a new argument, a setoff argument, when he submitted his brief to the Court. The Court refused to consider this argument because the argument was not within the framework of the two issues to which the parties stipulated.↩