ROBERT M. EPSTEN AND BEATRICE A. EPSTEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Epsten v. Commissioner
Docket No. 16989-88
United States Tax Court
T.C. Memo 1991-252; 1991 Tax Ct. Memo LEXIS 295; 61 T.C.M. (CCH) 2814; T.C.M. (RIA) 91252; June 5, 1991, Filed *295 Decision will be entered under Rule 155. Jack D. Farris, Clayton A. Reeves, John L. Ruppert, and Todd A. Fisher, for the petitioners. Michael D. Wilder, for the respondent. COHEN, Judge. COHEN
MEMORANDUM OPINION Respondent determined a deficiency of $ 23,265 in petitioners' Federal income taxes for 1984. Respondent also determined additions to tax under sections 6653(a)(1) and (2) and 6661(a) and increased interest under then section 6621(c). The deficiencies resulted from disallowance of deductions attributable to petitioners' investment in Capital Equipment Trust, an entity engaged in computer leasing. After concessions, the issues for decision involve petitioners' liability for the additions to tax under sections 6653(a) and 6661 and for increased interest under section 6621(c). Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All of the facts have been stipulated, including facts set forth in the record and the opinion in Van Roekel v. Commissioner, T.C. Memo 1989-74, *296 remanded 905 F.2d 80 (5th Cir. 1990). The Court of Appeals for the Fifth Circuit remanded Van Roekel to us after concluding that our discussion of the at risk issue did not affect the decision in that case. Thereafter the parties in this case were given an opportunity to present additional evidence and arguments on the at risk issue. Respondent conceded in this case other issues decided in favor of the taxpayer in Van Roekel, and petitioners conceded the at risk issue. The underpayment here thus results solely from petitioners' concession of the at risk issue, and the additions to tax and increased interest will be determined solely in relation to the at risk issue. The facts set forth below are found pursuant to the Stipulation of Proposed Findings of Fact and Ultimate Fact entered into by the parties in this case. Stipulated Facts
Petitioners resided in La Jolla, California, at the time their petition was filed. During 1984, and for approximately 40 years prior thereto, petitioner Robert M. Epsten, M.D., was a licensed doctor of internal medicine, specializing in cardiology. Petitioners timely filed their Federal income tax return for 1984, using *297 the cash method of accounting. On that return, they claimed deductions attributable to their investment in a grantor trust entitled "Capital Equipment Trust 1982" (the Trust). On April 15, 1988, respondent mailed to petitioners a statutory notice of deficiency disallowing depreciation, interest, and operating expense deductions and adjusting rental income attributable to items of IBM computer equipment (the equipment) that were owned and leased by the Trust. The Trust was a New York grantor trust formed generally for the purpose of acquiring, owning, leasing, and disposing of the equipment. The sponsors of the offering of interests in the Trust were Capital Associates International, Inc. (CAI), and Kidder, Peabody & Company, Inc. (Kidder Peabody). Units of beneficial ownership interest in the Trust (Units) were owned by investors, including petitioners, who purchased the Units in the offering pursuant to a Private Placement Memorandum, dated November 18, 1982. The Trust was formed pursuant to a Declaration of Trust, dated December 1, 1982, among the trustees and the persons (referred to as owners) who contributed funds to the Trust to enable the Trust to purchase the equipment. *298 Petitioners (who constituted an owner) purchased two Units, each of which represented a 1-percent beneficial interest in the Trust. Section 2.4 of the Declaration of Trust provided that the Trust would terminate no later than 9 years and 11 months from its formation. Sections 5.1 and 5.2 of the Declaration of Trust provided that rent from the equipment and proceeds from the sale of the equipment, after the payment of, or reserve for, liabilities of the Trust (including the Trust Note described below) and expenses, were to be distributed to the owners. During 1982, 1983, and 1984, CAI was a Colorado corporation primarily engaged in the business of equipment leasing and remarketing. Capital Equipment Corporation (CEC), a wholly owned subsidiary of CAI, was formed by CAI exclusively for the purpose of participating in the transactions at issue. Kidder Peabody was a nationally known investment banking firm. In October 1982, L. Burke Crouse (Crouse) of CAI contacted Kenneth F. Seplow (Seplow) of Kidder Peabody about a proposed sale of certain computer equipment to Kidder Peabody. Under Crouse's proposal, Kidder Peabody would resell the equipment to retail investors, who would *299 then lease the equipment back to CAI. Kidder Peabody declined to serve in the dual role of seller of the equipment and agent for the placement of the equity interests. Seplow proposed, however, introducing NIS Corporation (NIS) as the intermediary between CAI and an investor trust to be formed by Kidder Peabody. The investor trust would hold title to the equipment for the investors and lease it back to CAI or an affiliate of CAI. A Memorandum to the Commitment Committee of Kidder Peabody dated November 5, 1982, compared the proposed transaction to another transaction and stated: "Unlike the FAC [First Alliance Corporation] structure, an additional party will be introduced to acquire the equipment from Capital Associates and resell it to the investor trust, taking back a seven year recourse term note for a portion of the purchase price." A Summary of Capital Equipment Trust 1982 dated November 22, 1982, prepared by the Kidder Peabody "Tax Incentive Group" for Kidder Peabody's retail sales force, stated: NIS Corp. will purchase the equipment from CAI subject to the user leases and financing. The role of NIS Corp. in this sequence of transactions is to create an arm's length intermediate *300 sale between CEC and the Trust so that the recourse to the investors on the Trusts' financing will have substance for tax purposes. NIS Corp. has no other role of substance in the transaction. In November 1982, Kidder Peabody and CAI as cosponsors began offering investments in the Trust. The offering literature for the Trust, which Kidder Peabody furnished prospective investors, essentially consisted of a Private Placement Memorandum together with exhibits. In late November 1982, petitioners' investment advisor brought to their attention the possibility of investing in the Trust. Petitioners obtained, read, and understood the Private Placement Memorandum (together with the exhibits thereto) that described the investment. They also read and understood an appraisal that had been obtained by Kidder Peabody and projections relating to the economics of the investment. The Private Placement Memorandum listed risk factors that included: No rulings have been sought from the Internal Revenue Service with respect to any of the matters described in this Memorandum. If * * * a pro-rata portion of the Trust Note is not included in each Unitholder's amount "at risk", * * * virtually *301 all of the tax benefits described herein would not be available to the Investors or would be deferred. * * * The Private Placement Memorandum further emphasized that: PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY PRIOR OR SUBSEQUENT COMMUNICATION FROM THE SPONSORS OR THEIR AFFILIATES, OR ANY PROFESSIONAL ASSOCIATED WITH THIS OFFERING AS LEGAL OR TAX ADVICE. EACH INVESTOR SHOULD CONSULT HIS OWN PERSONAL COUNSEL, ACCOUNTANT AND OTHER ADVISERS AS TO LEGAL, TAX, ECONOMIC, AND RELATED MATTERS CONCERNING THE INVESTMENT DESCRIBED HEREIN AND ITS SUITABILITY FOR HIM. THE INFORMATION CONTAINED HEREIN HAS BEEN OBTAINED FROM SOURCES DEEMED RELIABLE, BUT NO REPRESENTATION OR WARRANTY IS MADE AS TO ITS ACCURACY, OR WITH RESPECT TO THE ECONOMIC RETURN OR TAX BENEFITS WHICH MAY ACCRUE TO INVESTORS. The Private Placement Memorandum advised each prospective investor, including petitioners, of the circumstances under which he or she could be liable, on account of the assumed debt, for amounts in excess of the cash purchase price of his or her Unit in the Trust: In the event the Trustee is unable to make payments when due, on the Trust Note and the Upgrade *302 Note, each Unitholder may be called upon to pay all or a portion of such obligation. Such an event may occur if CEC defaults on payments under the Main Lease. * * * The personal liability of a Unitholder for his proportionate share of the Trust Note and the Upgrade Note involves certain risks. First, each Unitholder is legally obligated to pay up to a designated amount with respect to the Notes. Failure of a Unitholder to honor his payment obligations may subject him to legal action and to encumbrance of his beneficial interest in the Trust. Second, the availability of projected tax benefits in excess of each Unitholder's cash investment depends upon the ability of each Unitholder to include the amount of his liability under the Trust Note and the Upgrade Note in his "at risk" amount for Federal income tax purposes. * * * * * * An investor's principal exposure under the Trust Note and the Upgrade Note lies in the possibility of a default by CEC under the Main Lease or a default by CEC under the Initial Liens, including the liens held by IBM. Whether due to bankruptcies or other causes, such defaults would leave the Trust without a separate source of funds for payments due *303 on the Trust Note and the Upgrade Note to Seller. However, it should be noted that CEC will agree not to engage in certain prohibited activities which might have the effect of increasing CEC's exposure to third party liabilities which may increase the possibility of such defaults. In addition, CEC's parent, CAI, will guarantee CEC's obligations under the Main Lease. * * * * * * There can be no assurance that the proceeds to which the Unitholders will be entitled from the lease or sale of the Equipment will be sufficient to pay all or any portion of such obligations and each Unitholder may therefore be called upon to pay his assumed portion thereof, in addition to paying when due the unpaid installments of his contribution to the Trust. It is anticipated, however, that if CEC makes lease payments to the Trust as and when due, that the Trust will have sufficient funds with which to make payments on the Trust Note and the Upgrade Note as and when due. * * * In the event the rental payments received by any prior purchaser are insufficient to pay principal of or interest on their respective Liens, the security interests could be subject to foreclosure and the Trust could lose all *304 its rights in and to the Equipment and proceeds from its lease or sale. A foreclosure of a security interest would not release any of the Unitholders from their obligation to make the required contributions to the Trust and would not release any of them from liability for their assumed portions of the Trust Note and the Upgrade Note. * * * * * * Each investor should recognize that although CEC may be in default on payments to be made to the Trust under the Main Lease and, even if the Trust's interest in the Equipment is foreclosed, payment by Unitholders will nevertheless be required of all contributions to be made to the Trust under the Declaration of Trust and under the notes evidencing such contribution, and the letters of credit or other collateral delivered as security for the payment thereof, and under the Assumption Agreements, as well as under the Trust Note and the Upgrade Note. * * * In addition, an investor may incur substantial adverse tax consequences upon any disposition of his Units. See "Federal Tax Consequences." Under section 3.2 of the Declaration of Trust, each owner, including petitioners, agreed to be liable to make additional contributions to the Trust *305 to the extent necessary to pay his or her assumed debt. Such obligation of each owner was to be reduced by the payments made by the Trust on its indebtedness and was to terminate when such indebtedness had been paid in full. The Private Placement Memorandum stated: "It is contemplated that all installments under the Trust Note will be paid out of or covered by Main Lease rental payments, each of which will exceed the corresponding installment due under the Trust Note." The Private Placement Memorandum also stated that "CAI will guarantee all obligations of CEC under the Main Lease." The sponsors of the Trust engaged Carro, Spanbock, Fass, Geller, Kaster & Cuiffo, a New York law firm (tax counsel), among other things, (a) to review the Federal income tax aspects of an investment in the Trust and the proposed Trust activities, (b) to prepare the tax-related portions of the Private Placement Memorandum, and (c) to issue an option regarding certain Federal income tax matters concerning the Trust. The portion of the Private Placement Memorandum entitled "FEDERAL TAX CONSEQUENCES" was prefaced as follows: It is impractical to set forth all aspects of Federal, state and local tax *306 law which may have tax consequences with respect to this investment and, thus, each prospective investor is urged and expected to consult with his own professional tax adviser to satisfy himself as to the tax consequences of this investment. The Federal tax considerations discussed below are necessarily general and their effect may vary depending upon a Unitholder's particular circumstances. The tax consequences of the transactions described in this offering are complex and are not free from doubt. There can be no assurances that some or all of the deductions applied against the income of the Trust may not be challenged by the Internal Revenue Service ("IRS"). Final disallowance of such deductions would, of course, adversely affect the Unitholders. The portion of the Private Placement Memorandum entitled "FEDERAL TAX CONSEQUENCES" advised each prospective investor, including petitioners, as follows regarding the assumed debt: It is Counsel's opinion that the amounts of the Trust note and the Upgrade Note for which the Unitholders are personally liable will constitute amounts "at risk" within the meaning of Section 465 of the Code. The "FEDERAL TAX CONSEQUENCES" portion of *307 the Private Placement Memorandum further stated: A taxpayer is not "at risk" to the extent he is protected against economic loss by reason of reimbursement arrangements, stop loss arrangements or other guarantees. Although it is Counsel's opinion that the Main Lease is not such an arrangement, there can be no assurance that the IRS will not take a contrary position. The proposed tax opinion of tax counsel (the tax opinion), included as exhibit 5 to the Private Placement Memorandum, stated as follows: We have considered the provisions of the Revised Formal Opinion 346 on Tax Shelter Opinions which was issued by the American Bar Association's Standing Committee on Ethics and Responsibility. In compliance therewith, we believe that this opinion, together with the sections in the Memorandum entitled "Tax Risks" and "Federal Tax Consequences," addresses all material tax issues involved in the transaction. In further compliance, it is our belief that the aggregate of the significant tax benefits contemplated by the Memorandum, which are a significant feature of the investment to the typical investor, are likely to be realized. Based upon and subject to the foregoing, we wish to advise *308 you that the section of the Memorandum entitled "Federal Tax Consequences" accurately reflects our opinion as to those matters set forth therein as to which an opinion is specifically attributed to us. In paragraph 2(c) of the Subscription Agreement, petitioners represented that: "The undersigned and his adviser(s) have sufficient knowledge and expertise in business, tax and financial matters to evaluate the merits and risks of an investment in the Trust and the undersigned has consulted with his adviser(s) in connection therewith." On their Federal income tax return for 1984, petitioners reported rental income of $ 104,140 from the leasing of the equipment and claimed deductions for depreciation of $ 91,063 on the equipment, interest of $ 54,922 on Trust indebtedness, interest of $ 4,089 on the interest-bearing Investor Note, and operating expenses of $ 597 on the equipment, resulting in a claimed net loss of $ 46,531. Petitioners did not, for any taxable year, claim investment tax credit with respect to their investment in the Trust. There was a reasonable possibility that the Trust's activities would result in an economic profit, apart from the tax benefits, to the Trust and *309 petitioners. The transactions at issue had economic substance. The Trust acquired sufficient benefits and burdens of ownership to make it the owner of the equipment for tax purposes. The Trust and petitioners had an actual and honest profit objective with respect to the transactions at issue. The Trust Notes executed by the Trust were genuine obligations of the Trust and its investors (including petitioners) for tax purposes. Van Roekel On The At Risk Issue
In Van Roekel v. Commissioner, T.C. Memo 1989-74, remanded 905 F.2d 80 (5th Cir. 1990), we discussed the at risk issue and concluded: In view of all of the evidence, we do not believe that NIS's participation served any valid business purpose. Crouse of CAI initially proposed that the equipment be sold directly to Kidder Peabody. Kidder Peabody, however, wanted to promote the transaction for investors in the Trust and did not want to appear to be directly involved as a party in the sale-leaseback transaction. Kidder Peabody proposed instead that a subsidiary of CAI (CEC) sell the equipment to NIS and that NIS sell the equipment to the Trust. After the deal was arranged, Kidder *310 Peabody prepared a summary of the transactions for its retail sales force, which summary clearly and explicitly stated that the exclusive role of NIS was to give substance to the Trust's putative recourse financing for tax purposes. At trial Seplow unpersuasively attempted to explain away this document by stating that "it was appropriate to have a sale of equipment * * * through an intermediary" and that he "felt it was essential to have a substantial independent company in the transaction * * *." Seplow gave no credible nontax-motivated purpose, however, for NIS in this transaction. [56 T.C.M. (CCH) 1297, 1306-1307, T.C. Memo 1989-74, 1989 Tax Ct. Memo LEXIS 74, T.C.M. (RIA) 89074 at 339-340.] For reasons stated in that opinion, we rejected respondent's contention that the Trust Note was not genuine. We agreed with respondent, however, that the taxpayer was protected against loss with respect to the Trust Note. After reviewing the various documents of the sale-leaseback transaction, we found that the taxpayer was guaranteed against having to pay any portion of the Trust Note, notwithstanding its ostensible recourse provisions. We rejected the taxpayer's arguments and concluded that the *311 taxpayer was not at risk with respect to his share of the Trust Note. We sustained respondent's determination that the taxpayer in Van Roekel was liable for the addition to tax under section 6653(a), for reasons unrelated to the at risk issue and not applicable to these petitioners. We also sustained the addition to tax under section 6661 in Van Roekel, rejecting the taxpayer's contention that cases previously decided and section 465 constituted substantial authority for the taxpayer's position. We concluded that the authorities relied on by the taxpayer were distinguishable and that the addition to tax should be imposed, citing Antonides v. Commissioner, 91 T.C. 686, 702-703 (1988), affd. 893 F.2d 656 (4th Cir. 1990). We also held that the increased rate of interest under section 6621(c) applied to the underpayment attributable to that portion of the loss disallowed by section 465(a). The parties in this case are not bound by our decision on the additions to tax and increased interest issues in Van Roekel and have discussed in their briefs matters not addressed in Van Roekel. Section 6653(a)
Section 6653(a) imposes an *312 addition to tax if any portion of an underpayment is due to negligence. Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947-948 (1985). Reasonable reliance on expert advisers generally negates applicability of the addition to tax for negligence. See, e.g., Industrial Valley Bank & Trust Co. v. Commissioner, 66 T.C. 272, 283 (1976). Respondent argues that the documents relied on by petitioners, including the Private Placement Memorandum, placed petitioners on notice of their lack of entitlement to the losses claimed in 1984. At the time petitioners' tax return for the year in issue was filed, however, there was little case law on the extent of relatively recent section 465(b)(4). The subsequent cases have limited the scope of that section and reached different results on various distinctions. There are no indications here that the professional advice given petitioners was not reasonable or was not given by qualified persons. Our opinion in Van Roekel was based in substantial part on our discussion of the role of NIS, *313 quoted above, which led us to conclude: "NIS's function in the transaction was nothing more than 'window dressing' to enable the Trust investors to avoid the at-risk provisions of section 465 and to make the transaction appear to be a genuine multiple-party transaction." 56 T.C.M. at 1307, 58 P-H Memo T.C. par. 89,074 at 340. That conclusion relied on the internal Kidder Peabody memorandum, and there is no evidence that petitioners were aware of that memorandum or the purpose of NIS as stated in the memorandum. The parties have cited numerous cases discussing whether the additions to tax for negligence were to be applied to particular fact situations. None of them is directly in point or controlling, and we see no reason to discuss them. On the facts stipulated by the parties, we conclude that petitioners were not negligent. Section 6661
A taxpayer's burden to overcome respondent's determination of an addition to tax under section 6661 is greater than a taxpayer's burden to show lack of negligence under section 6653(a). Under section 6661, the applicability of the addition to tax is initially determined under a mathematical formula, and, unless *314 upon a request respondent waives the addition to tax, the taxpayer must show various threshold matters before being relieved of the addition to tax. Section 6661 for the year in issue provides: SEC. 6661. SUBSTANTIAL UNDERSTATEMENT OF LIABILITY. (a) Addition to Tax. -- If there is a substantial understatement of income tax for any taxable year, there shall be added to the tax an amount equal to 25 percent of the amount of any underpayment attributable to such understatement. (b) Definition and Special Rule. -- * * * (2) Understatement. -- (A) In general. -- For purposes of paragraph (1), the term "understatement" means the excess of -- (i) the amount of the tax required to be shown on the return for the taxable year, over (ii) the amount of the tax imposed which is shown on the return, reduced by any rebate (within the meaning of section 6211(b)(2)). (B) Reduction for understatement due to position of taxpayer or disclosed item. -- The amount of the understatement under subparagraph (A) shall be reduced by that portion of the understatement which is attributable to -- (i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such *315 treatment, or (ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return. (C) Special rules in cases involving tax shelters. -- (i) In general. -- In the case of any item attributable to a tax shelter -- (I) subparagraph (B)(ii) shall not apply, and (II) subparagraph (B)(i) shall not apply unless (in addition to meeting the requirements of such subparagraph) the taxpayer reasonably believed that the tax treatment of such item by the taxpayer was more likely than not the proper treatment. (ii) Tax shelter. -- For purposes of clause (i), the term "tax shelter" means -- (I) a partnership or other entity, (II) any investment plan or arrangement, or (III) any other plan or arrangement, if the principal purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax. * * * (c) Authority to Waive. -- The Secretary may waive all or any part of the addition to tax provided by this section on a showing by the taxpayer that there was reasonable cause for the understatement (or part thereof) and that the taxpayer acted in good *316 faith. Petitioners contend that section 6661 does not apply in this case either because they had substantial authority for the tax treatment of the Trust items on their tax return or respondent abused his discretion in refusing to waive the additions to tax. Respondent contends that petitioners' investment in the Trust was a tax shelter and that, therefore, petitioners must establish that they reasonably believed that their tax treatment of the transaction was more likely than not the proper treatment. In stipulating that the transaction involved a possibility of profit, that it had economic substance, and that petitioners had an actual and honest profit objective, respondent has negated categorization of the investment as one having as its principal purpose "the avoidance or evasion of Federal income tax." Respondent's argument is based on our conclusion that NIS was inserted in the transaction only for tax purposes. That conclusion as to NIS, however, does not taint the total transaction. It was an incidental part of our analysis and not the crux of our holding. Compare Offermann v. Commissioner, T.C. Memo 1988-236, on appeal (4th Cir., Dec. 12, 1988), *317 relied on by respondent, in which the transaction was found to be a tax shelter. Our ultimate conclusion in Van Roekel that the taxpayers were not at risk on a portion of the Trust Note was based on the guarantee by CAI of CEC's obligation, which converted a putatively recourse liability to a liability nonrecourse in substance. Although nonrecourse in substance, the note, we found, was nonetheless genuine. Use of nonrecourse financing does not, standing alone, establish that tax avoidance was the primary purpose of a transaction. We did not and do not characterize either the Trust or the note as a tax shelter within the meaning of section 6661(b)(2)(C)(ii). Petitioners, therefore, need not show in this case that they believed that the treatment on their tax return was more likely than not the proper treatment. Petitioners argue that the substantial authority issue must be addressed to the "item" of petitioners' deductions "viewed on an overall basis," i.e., their deductions arising out of their investment in the Trust. Inasmuch as issues other than the at risk issue are to be resolved in favor of petitioners as a result of respondent's concession, petitioners argue that *318 section 6661 should not be applied merely because their deductions are disallowed to the extent that petitioners were not at risk. Petitioners rely on Moser v. Commissioner, T.C. Memo 1989-142, affd. 914 F.2d 1040 (8th Cir. 1990). This argument was neither made nor addressed in Van Roekel, and Moser was decided subsequent to Van Roekel. In Moser, we stated: In the instant case, we think petitioners had substantial authority for their position that they were entitled to deductions (and thus implicitly at risk) on the bases of their Limited Recourse notes. The substantial authority standard of section 6661(b)(2)(B)(i) is not so stringent that a taxpayer's tax treatment must be treatment which ultimately is upheld in litigation or which has a greater than 50-percent likelihood of being upheld in litigation. Sec. 1.6661-3(a)(2), Income tax Regs. We find that the totality of facts before us, especially the fact that petitioners' Limited Recourse notes and the Finalco/Lease Pro notes were recourse by their terms and the fact that petitioners' equipment reasonably was predicted to retain sufficient value for petitioners to be able *319 to show a profit on their investment, are such that petitioners had substantial authority for their tax treatment. Cf. Antonides v. Commissioner, 91 T.C. at 702-704. We therefore hold that petitioners are not liable for the section 6661 additions to tax. [ T.C. Memo 1989-142, 1989 Tax Ct. Memo LEXIS 142, 56 T.C.M. (CCH) 1604, 1632, T.C.M. (RIA) 89142 at 685-686.] Section 1.6661-3(b), Income Tax Regs., provides as follows: (b) Determination of whether substantial authority is present -- (1) Evaluation of authorities. There is substantial authority for the tax treatment of an item only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities relevant to the tax treatment of an item, including the authorities contrary to the treatment, are taken into account in determining whether substantial authority exists and the weight of those authorities is determined in light of the pertinent facts and circumstances in the manner prescribed in paragraph (b)(3) of this section. There may be substantial authority for more than one position with respect to the same item. * * * * * * (3) Nature of analysis. Except *320 as otherwise provided in this section, the weight of the authorities for the tax treatment of an item is determined by the same analysis that a court would be expected to follow in evaluating the tax treatment of the item. Thus, the weight of authorities depends on their persuasiveness and relevance as well as their source. * * * Petitioners cite a long list of cases supporting their position on the overall substance of the transaction. Inasmuch as petitioners have prevailed on the issues, we need not discuss all of those authorities. Petitioners rely on a shorter list of cases in support of their assertion that "looking at the at-risk issue alone, Petitioners had substantial authority for their Deductions." They cite Levy v. Commissioner, 91 T.C. 838 (1988); Gefen v. Commissioner, 87 T.C. 1471 (1986); Brady v. Commissioner, T.C. Memo 1990-626; Emershaw v. Commissioner, T.C. Memo 1990-246, on appeal (6th Cir., Sept. 21, 1990); Rubin v. Commissioner, T.C. Memo 1989-484; B & A Distributing Co. v. Commissioner, T.C. Memo 1988-589. Petitioners rely particularly *321 on Emershaw and Brady as involving "nearly identical facts." Weighing authorities for and against a position is much more difficult than comparing the number of cases that a taxpayer lost on a particular issue with the number of cases that a taxpayer won on that issue. In Antonides v. Commissioner, supra, we stated: Sec. 1.6661-3(b)(2), Income Tax Regs. * * * thus makes it clear that substantial authority here refers to legal precedents which would support the taxpayer's application of the law to a given fact or set of facts. The weight of the authorities for the tax treatment of an item is determined by the same analysis that a court would be expected to follow in evaluating the treatment of the item. Thus, an authority is of little relevance if it is materially distinguishable on its facts from the facts of the case at issue. Sec. 1.6661-3(b)(3), Income Tax Regs. [91 T.C. 686 at 702-703.] In Antonides, we compared the taxpayers' yacht-chartering activities to other cases in which a taxpayer had established a profit objective in a yachting activity and concluded that the other cases were materially distinguishable on the *322 facts. In a situation such as Antonides, the distinguishing facts were known and understood by the taxpayers. In this case, however, the issue decided against petitioners is a legal conclusion drawn from complex and interrelated contractual documents. In our view, the substantial authority issue narrows to whether the distinguishing facts in Brady and Emershaw, leading to different holdings on the at risk issue, cause those cases to be materially distinguishable from this case within the meaning of Antonides. In Emershaw, the Court stated in a footnote: In Van Roekel v. Commissioner, T.C. Memo 1989-74, for example, we disregarded an intermediate purchaser of computer equipment because the interposition of that party lacked business purpose. After noting that the party's purchase money liability was nonrecourse, we held that the taxpayer's liability also was nonrecourse in substance. In the instant case, respondent conceded the substance of Program, the intermediate purchaser. [ T.C. Memo 1990-246, 1990 Tax Ct. Memo LEXIS 253, 59 T.C.M. (CCH) 621, 631 n.12, T.C.M. (RIA) 90246 at 1132.] Respondent's concession of the substance of an intermediary in *323 Emershaw and our conclusion of the lack of nontax substance of NIS in Van Roekel occurred during litigation. That difference cannot be regarded as a fact distinguishing the transactions at the inception any more than the ultimate resolution of the issue can be the distinguishing fact. Respondent has not pointed to any materially distinguishing facts between those found in Emershaw and those found herein with respect to the agreements between the investors and the investment entity. We do not readily discern any, and we doubt that taxpayers such as petitioners would have been able to discern any when they filed their tax return. In Brady v. Commissioner, supra, the Court compared the facts in that case with the facts in Emershaw and the facts in Van Roekel and concluded: We find the facts in this case to be closer to those in Emershaw. We believe that petitioner is not protected from loss by the Stratford Guaranty because the guarantee does not protect petitioner from ultimate liability for the long-term note. The guarantee merely diminishes the possibility that petitioner will be unable to collect the rent to which he is entitled. *324 Petitioner remains the debtor of last resort with respect to the long-term note. Our position is further supported by the fact that the Stratford Guaranty provided that in the event petitioner failed to make the payments under the long-term note, Stratford was not obligated to make further rental payments until petitioner made the payments on the long-term note. This fact distinguishes this case from Van Roekel in which the creditor had the option to set off, against its payment of the rent to the Trust, the amount which NIS owed. [ T.C. Memo 1990-626, 1990 Tax Ct. Memo LEXIS 712, 60 T.C.M. (CCH) 1415, 1421, T.C.M. (RIA) 90626 at 3067.] Again, those facts were discerned after a detailed analysis of the effect of various agreements and would not be the type of facts known to investors at the time the return was filed. Except for the ultimate holding on the at risk issue, the facts of the cases of Emershaw and Brady are closer to those in this case than are the facts in cases relied on by respondent: Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990), affg. T.C. Memo 1987-628, affg. Moore v. Commissioner, T.C. Memo 1987-626, *325 affg. Sturm v. Commissioner, T.C. Memo 1987-625, affg. and revg. on another issue Larsen v. Commissioner, 89 T.C. 1229 (1987) (in which the transactions were held to lack economic substance); American Principals Leasing Corp. v. United States, 904 F.2d 477 (9th Cir. 1990); HGA Cinema Trust v. Commissioner, T.C. Memo 1989-370, on appeal (7th Cir., May 15, 1990); Offermann v. Commissioner, T.C. Memo 1988-236, on appeal (4th Cir., Dec. 28, 1988). We conclude that the legal precedents that support petitioners' application of the law to the facts of this case are substantial in relation to the weight of authorities supporting contrary positions. They are not liable for the addition to tax under section 6661. Section 6621(c)
Section 6621(c), for the year in issue, provides an increased rate of interest on an underpayment attributable to that portion of a loss disallowed by section 465(a). Sec. 6621(c)(3)(A)(ii). Petitioners contend that, because they have conceded the at risk issue on a stipulation that states that the concession is not "on the merits," the increased interest *326 should not apply. Petitioners rely on McCrary v. Commissioner, 92 T.C. 827, 857-859 (1989), and Rogers v. Commissioner, T.C. Memo 1990-619. Petitioners' reliance is misplaced. In McCrary v. Commissioner, supra, and similar cases, we declined to sustain the application of section 6621(c) (or the addition to tax under section 6659) when a taxpayer's concession removed the necessity of deciding which of several alternative grounds for disallowing an item applied. When some of the alternative grounds were "tax-motivated transactions" for purposes of section 6621(c) and some were not, we could not say, after the concession, that the resulting underpayment was attributable to a particular ground. In this case, however, the underpayment is only attributable to petitioners' concession of the at risk issue, and it is irrelevant whether that issue was conceded, settled, or determined against petitioners by the Court. Petitioners have shown no reason to disregard the mechanical application of section 6621(c) to this case. Increased interest on the underpayment is therefore owing. Decision will be entered under Rule 155 *327 .